BROWN, Chief Judge.
| plaintiffs, Deborah and Calvin Harper, appeal the trial court’s granting of a directed verdict in favor of defendants, Drs. Claude Minor and John Davis. For the reasons stated herein, we reverse.

Facts and Procedural Background

On January 16, 2003, plaintiff, Deborah Harper, underwent a routine bilateral mammogram screening procedure which identified a small lesion in her left breast. Mrs. Harper was referred to defendant, Dr. Claude Minor, a general surgeon, for further assessment. Dr. Minor confirmed that Mrs. Harper did have an abnormal mammogram. After consultation and discussion with Dr. Minor, Mrs. Harper elected to have the mass removed. A needle localization excisional biopsy of the lesion was scheduled for February 24, 2003, at North Monroe Medical Center. Dr. Minor and defendant, Dr. John Davis, a radiologist, performed the procedure.
The procedure entailed the radiologist “localizing” the lesion. Using ultrasound guidance, Dr. Davis inserted a five centimeter Kopan’s hook wire into the breast with the hook overlapping the lesion. He confirmed the placement by mammogram, X-ray image. The patient was then taken to the operating room where she was prepped and anesthetized. The operating surgeon, Dr. Minor, reviewed the mammogram to ensure that the lesion was properly located and to determine how he would approach the lesion. Dr. Minor commenced the surgery, located what he believed to be the lesion mass, and removed it. After the mass was removed, the excised tissue and wire were sent to radiology where an X-ray was taken of the tissue and compared to the pre-procedure mammogram to determine if the targeted [2Iesion was fully removed. Dr. Davis concluded that the oval mass removed by Dr. Minor corresponded to the mass seen on the earlier mammogram. He also concluded that the Kopan hook wire was overlapping the specimen. Dr. Davis called the operating room and informed Dr. Minor, who then sutured the patient and ended the procedure. The tissue that was removed was then sent to the pathologist for testing. The pathologist determined that the mass removed by Dr. Minor was not a fibroadenoma, a benign breast tumor, but was a fibrosis, breast tissue.
Approximately ten months later, Mrs. Harper underwent another bilateral mammogram, which revealed that a three centimeter portion of the hook wire and the earlier targeted lesion remained intact in her breast. As a result, a second needle localization was performed by Dr. Minor, wherein the wire fragment and the benign fibroadenoma lesion were successfully removed.
Plaintiffs filed a medical review panel complaint against Drs. Davis and Minor and the North Monroe Medical Center. The medical review panel found in favor of defendants, and plaintiffs subsequently *693 filed the present medical malpractice suit. The review panel for Dr. Davis stated:
It is unfortunate that a segment of the hook wire along with the targeted breast mass remained in the patient. However, it was later discovered by a follow-up mammogram and was appropriately addressed and excised in subsequent surgery by Dr. Minor. As best we can tell, the second surgical procedure was uneventful and the excised mass was found to be benign.
The lawsuit was originally filed against Dr. Minor on January 19, 2007, and then later amended to include Dr. Davis on October 30, 2008. The case proceeded to jury trial in February 2011, wherein, upon Iscompletion of plaintiffs’ case, defendants moved for directed verdicts, which the trial court granted.
Plaintiffs appealed the trial court’s granting of directed verdicts in favor of Drs. Minor and Davis.

Discussion

Directed Verdicts

A directed verdict should be granted when, after considering all eviden-tiary inferences in the light most favorable to the non-moving party, it is clear that the facts and inferences so overwhelmingly favor a verdict for the movant, that reasonable jurors could not have arrived at a contrary conclusion. Tanner v. Cooksey, 42,010 (La.App.2d Cir.04/04/07), 954 So.2d 335, writ denied, 07-0961 (La.06/22/07), 959 So.2d 508. A trial court has much discretion in determining whether to grant a motion for directed verdict. Id.
A plaintiff bears the burden of proving that a doctor committed malpractice. Wiley v. Lipka, 42,794 (La.App.2d Cir.02/06/08), 975 So.2d 726, writ denied, 08-0541 (La.05/02/08), 979 So.2d 1284. A medical malpractice claimant must establish, by a preponderance of the evidence: (1) the defendant’s standard of care; (2) the defendant’s breach of that standard of care; and (3) a causal connection between the breach and the claimant’s injuries. La. R.S. 9:2794(A); Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94), 643 So.2d 1228; Bamburg v. St. Francis Medical Center, 45,024 (La.App.2d Cir.01/27/10), 30 So.3d 1071, writ denied, 10-0458 (La.04/30/10), 34 So.3d 294.
bin Bamburg, supra at 1075, we stated:
The Louisiana Supreme Court has found that expert testimony is not always necessary in order for a plaintiff to meet his burden of proof in establishing a medical malpractice claim. In Pfiffner, 643 So.2d at 1233, the supreme court explained, “Expert testimony is not required where the physician does an obviously careless act, such as fracturing a leg during examination, amputating the wrong arm, dropping a knife, scalpel, or acid on a patient, or leaving a sponge in a patient’s body, from which a lay person can infer negligence.” In most cases, however, because of the complex medical and factual issues involved, a plaintiff who does not present medical expert testimony will likely fail to sustain his burden of proving his claim under the requirements of La. R.S. 9:2794. (Citations omitted).
Plaintiffs contend that the trial court erred in granting defendants’ motions for directed verdict. Plaintiffs contend that expert testimony was not necessary to establish malpractice, as these were obviously careless acts and, as such, negligence could be inferred.
Dr. Davis testified that the targeted mass was a suspected fibroadenoma, and that the tissue removed was subsequently determined by a pathologist to be fibrosis. According to Dr. Davis, the radiograph of the specimen removed had the same *694 shape, color, and density as the targeted lesion, a suspected fibroadenoma. Dr. Davis stated that he was not aware that it was fibrosis until pathology issued its report. Moreover, Dr. Davis testified that the wire appeared to hook around the oval density that was excised. In the present case, Dr. Davis opined that the wire got bent in such a way that it appeared to have a hook on it. Based upon the appearance of the removed tissue and the presence of the hook wire overlapping the tissue, Dr. Davis testified that it was his determination that the targeted mass was properly excised and the hook portion of the wire removed.
|5It appears that either Dr. Davis placed the hook wire overlapping the wrong mass or Dr. Minor cut the wire and took out the wrong mass. The fibroadenoma identified in the initial mammogram overlapped with the hook wire remained in Mrs. Harper after the surgical procedure.
Although the procedure itself may be considered routine, considering the procedure as a whole, specifically the judgment calls required of Drs. Minor and Davis, it is clear that this is not a scenario from which lay persons could infer negligence on the parts of Drs. Minor and Davis. Thus, it was imperative that plaintiffs put forth medical expert testimony sufficient to sustain their burden of proof.

Plaintiffs’ Expert Witness

Plaintiffs attempted to get Dr. Roderick Boyd accepted as an expert witness in the interpretation of radiographic images, which the trial court denied. Plaintiffs did not offer any other expert in the field of radiology before closing their case-in-chief.
The trial court has wide discretion to decide whether a particular witness will be allowed to testify as an expert, and its judgment will not be disturbed by an appellate court unless it is manifestly erroneous. Mistich v. Volkswagen of Germany, Inc., 95-0939 (La.01/29/96), 666 So.2d 1073; Johnson v. English, 34,322 (La.App.2d Cir.12/20/00), 779 So.2d 876.
Plaintiff sought to tender Dr. Boyd as an expert in the field of general surgery and interpretation of radiographic images. Defendants objected and, after a brief voir dire, the trial court accepted Dr. Boyd as an expert in the field of general surgery but found that his level of expertise in the field | (¡of radiology did not rise to the level needed to give an opinion as to the standard of care required of a radiologist and the placement of the guide wire.
Specifically, voir dire revealed that, as a general surgeon, Dr. Boyd had performed several hundred needle localization breast biopsies. He does regularly review radiographic images as a function of his occupation as a general surgeon and in connection with biopsies such as the one performed in this case.
Dr. Boyd regularly performs these procedures and most importantly regularly reviews the radiographic images. Not to accept Dr. Boyd as an expert in this type of procedure to include a reading of the radiographic images was clear error.
Dr. Boyd’s knowledge of the requisite standard of care is evidenced by the following discourse between him and the trial court:
THE COURT:
Now, Dr. Boyd, let me just ask you this. All right. You testified that, you know, that any surgeon would — once the results (radiographs) come back (showing the insertion of the wire and lesion) and you’re called upon to go in and remove the lesion, you would look at those images yourself.
DR. BOYD:
*695 Yes.
THE COURT:
That was your testimony?
DR. BOYD:
Correct.
THE COURT:
Now, if you looked at this lesion and you made a determination or you looked at the results of the report from the radiologist and you disagreed with it, what would you do?
|7DR. BOYD:
Get another film.
THE COURT:
You’d go back to the radiologist?
DR. BOYD:
Get another film. Look at it with the radiologist,—
THE COURT:
Right.
DR. BOYD:
—have a discussion—
THE COURT:
Consult with the radiologist and then perform your procedure once you’re satisfied in speaking with the radiologist that to your satisfaction this radiological report and the interpretation of these reports or these images are correct?
DR. BOYD:
Yes.
THE COURT:
Okay. Well, I think that goes right to the issue, Mr. Nwokorie. If you — he still would have to go back. If he looks at the report from the radiologist and disagrees with it, he wouldn’t just go on his own and act as a general surgeon; he would go back to the radiologist and he would consult with the radiologist after additional imaging is taken, after additional interpretations are made and then, and only then, would he act in the field of a general surgeon.
MR. NWOKORIE:
And I agree with that. I agree with that. But what I’m saying is that he is able to see that it was placed not in the right place. As long as I — I’m not saying that—
THE COURT:
But if he’s asked to testify whether this device placed in that place by a radiologist is in the right or -wrong place, then he is commenting on whether the radiologist breached the standard of care. Okay. Not the general surgeon. He is qualified to make a comment as to whether the general surgeon breached that standard of care only. And he cannot comment on whether the radiologist breached the standard of care. And if you ask him to testify as to whether this device was placed in the proper | ¡¡place to locate the lesion, then that is infringing on an area of expertise that he is not qualified to testify in.
[[Image here]]
THE COURT:
So I’ll sustain the — I’m going to sustain the objection as it relates to his qualifications in the area of radiology and I’m not going to allow him to testify as it relates to the standard of care as it relates to a radiologist.
MR. NWOKORIE:
Your Honor, just so-but can he testify that I reviewed this, this is what I see in these films? I can see them, but without offering an opinion. Can he say this is what I see without offering an opinion? I’m not going to ask him to offer an opinion, Your Honor.
THE COURT:
So this is what I see; I’ve reviewed the films and this is what I see. I see that *696 this is placed in the wrong place. That’s an opinion.
[[Image here]]
THE COURT:
That’s an opinion as to the ultimate issue as to breach of the standard of care by the radiologist. He’s not qualified to do so.
To prevail in a medical malpractice case, the plaintiff must establish the standard of care applicable to the charged physician, a violation by the physician of that standard of care, and a causal connection between the physician’s alleged negligence and the plaintiffs injuries resulting therefrom. La. R.S. 9:2794(A).
Where the alleged acts of negligence raise issues peculiar to a particular specialty, then only those qualified in that specialty may offer evidence of the applicable standard of care. La. R.S. 9:2794(A)(1).
La. R.S. 9:2794(D)(3) provides:
In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the|3witness is board certified or has other substantial training or experience in an area of medical practice relevant to the claim and is actively practicing in that area. (Emphasis added).
Thus, a specialist’s knowledge of the requisite subject matter, rather than the specialty or subspecialty within which the specialist practices, determines whether a specialist may testify as to the degree of care which should be exercised. A particular specialist’s knowledge of the subject matter on which he is to offer expert testimony should be determined on a case by case basis. McLean v. Hunter 495 So.2d 1298 (La.1986).[1]
After our review of the record and relevant case law, we find that Dr. Boyd was qualified to testify as to the standard of care expected of a radiologist as to the procedure in this particular case.
Without question, Dr. Boyd is an expert in reading the films and determining the correct placement of the hook wire. If the placement was correct, then questions are presented as to Dr. Minor’s work; if not, these | inare issues as to Dr. Davis’s work. Clearly, Dr. Minor reviewed the films and had the responsibility to determine that the placement was correct and make the decision to go ahead with the procedure.
We cannot speculate on Dr. Boyd’s opinion or its impact on the jury’s decision. Nonetheless, the trial court, in denying Dr. Boyd the opportunity to testify as an expert regarding the interpretation of the radiographic images involved in this proce *697 dure, one he has performed hundreds of times, committed clear error. As any expanded testimony could foreseeably impact Dr. Davis, as well as Dr. Minor, we must reverse the trial court’s grant of both defendants’ motions for directed verdict, and remand for further proceedings.

Conclusion

Based on the foregoing reasons, the trial court’s grant of directed verdicts in favor of defendants, Drs. Claude Minor and John Davis, is hereby reversed and the case is remanded for further proceedings. Costs are assessed to defendants.

. In Roberts v. Warren, 01-1342 (La.06/29/01), 791 So.2d 1278, the Louisiana Supreme Court held that a board certified oral surgeon was qualified to testify as an expert in a dental malpractice case against a general dentist regarding the applicable standard of care in dealing with the extraction of teeth.
In Soteropulos v. Schmidt, 556 So.2d 276 (La.App. 4th Cir.1990), the court found that where medical disciplines overlap, specialists in one field may give expert testimony as to the standard of care applicable to areas of the practice of medicine common to both disciplines; orthopedic surgeons were allowed to give their expert opinions regarding a vascular surgeon's adherence to the standard of care in performing a below-knee amputation.
In Smith v. Juneau, 94-2440 (La.09/29/94), 642 So.2d 860, the Louisiana Supreme Court ordered that a physician who practiced in physical medicine and rehabilitation be allowed to testify as to the standard of care applicable to an orthopedic surgeon.
In Slavich v. Knox, 99-1540 (La.App. 4th Cir.12/15/99), 750 So.2d 301, the appellate court held that the trial court did not err in allowing a general surgeon to testify as to the standard of care applicable to an internist who failed to diagnose a liposarcoma in a female patient.