HARRISON, Judge Pro Tern.
|, The plaintiff, Patricia Carroll Crock-ham, appeals from a jury verdict and trial court judgment rejecting her medical malpractice claims against Dr. David Thompson and Richardson Medical Center (“RMC”). The claims arose from the death of the plaintiffs mother, Stella Carroll. For the following reasons, we affirm.
FACTS
Ms. Carroll was 68 years old and had been a paraplegic for 20 years, following surgery on her spine. She was wheelchair-bound. For several years prior to her death, she frequently had bowel obstructions. On February 17, 2006, she was vomiting, had shortness of breath, fever, constipation, and sweating. She had *722 thrown up her medications that morning. At 8:00 a.m., Ms. Crockham had her mother taken by ambulance to the emergency room of RMC. Ms. Carroll had not had a bowel movement in four days.
A fecal impaction was removed. Ms. Carroll was released to return home. Her symptoms did not improve, and Ms. Crock-ham had her mother transported to the emergency room at 12:30 p.m. that day. Her abdomen was large and distended. She was discharged to return home with a laxative.
When Ms. Carroll failed to improve, Ms. Crockham had her mother transported to the emergency room at 8:30 p.m. that same day. A different doctor was on duty who called Dr. Thompson, Ms. Carroll’s longtime treating physician. Ms. Carroll was admitted to the hospital under Dr. Thompson’s care.
12After Ms. Carroll arrived on the hospital floor, a nurse notified Dr. Thompson that the patient’s blood pressure was elevated; the reading was 190/122. Dr. Thompson ordered a nasogastric (“NG”) tube for nausea and prescribed blood pressure medication to be given orally. The next day, Ms. Carroll suffered a brain hemorrhage allegedly caused by her high blood pressure. She was placed in the intensive care unit (“ICU”) on life support. On February 21, 2006, her family had her removed from life support and she died.
The plaintiff submitted her claims of malpractice against Dr. Thompson, RMC, and the first emergency room physician, Dr. James Ewlynn Ball, Jr., to a medical review panel. On March 16, 2010, the medical review panel unanimously found that Dr. Thompson was negligent and breached the applicable standard of care. The panel found that Dr. Ball and RMC did not breach the standard of care. On May 20, 2010, Ms. Crockham filed suit against Dr. Thompson, RMC, and Dr. Ball.
She asserted wrongful death and survival actions and claimed damages for loss of love, support, and affection. Dr. Ball was released from the suit on a motion for summary judgment. The claims against Dr. Thompson and RMC were tried before a jury in August 2011. On August 26, 2011, the 12-person jury returned a unanimous verdict finding that Dr. Thompson and RMC were not at fault in causing the death of Ms. Carroll. On September 26, 2011, the trial court filed a judgment making the verdict of the jury the judgment of the court. | ¡¡The trial court denied Ms. Crockham’s motions for judgment notwithstanding the verdict and for new trial. The plaintiff appealed.
FAULT OF DR. THOMPSON
The plaintiff contends that the jury erred in finding that Dr. Thompson was not at fault and that his fault was not a substantial factor in causing the death of Ms. Carroll. Ms. Crockham argues that Dr. Thompson breached the applicable standard of care in numerous ways. She claims that he should have admitted her mother to the ICU, should have seen her upon her admission to the hospital, should have come to the hospital when notified that Ms. Carroll’s blood pressure was critically high, and should have made rounds the next morning. Ms. Crockham alleges that Dr. Thompson breached the standard of care by failing to establish proper parameters regarding when the nurses should contact him regarding Ms. Carroll’s blood pressure, by failing to follow up with a phone call to determine if the blood pressure medication was working, and by ordering the administration of oral blood pressure medicine where the patient had been suffering from nausea. The plaintiff argues that Ms. Carroll’s blood pressure medication should have been given by the intravenous (“IV”) method, which would *723 have bypassed her nonfunetioning bowel. According to Ms. Crockham, her mother’s blood pressure was never controlled and caused her fatal stroke. These arguments are without merit.
Legal Principles
A plaintiff bears the burden of proving that a doctor committed malpractice. Harper v. Minor, 46,871 (La.App.2d Cir.2/1/12), 86 So.3d 690; writs denied, 2012-0524 (La.4/27/12), 86 So.3d 629, 2012-0528 (La.4/27/12), 86 So.3d 632. La. R.S. 9:2794(A) provides in pertinent part:
In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., ... the plaintiff shall have the burden of proving:
(1)The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or faded to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
When a medical malpractice action is brought against a physician, the plaintiff must establish the standard of care applicable to the physician, a violation of that standard of care by the physician, and a causal connection between the physician’s alleged negligence and the plaintiffs resulting injuries. Pfiffner v. Correa, 94-0924 (La.10/17/94), 643 So.2d 1228; Johnson v. Morehouse General Hospital, 2010-0387 (La.5/10/11), 63 So.3d 87; Harper v. Minor, supra. A physician is not held to a standard of absolute precision. Rather, his conduct and judgment are evaluated in terms of reasonableness under the existing circumstances, not on the basis of hindsight. Lowrey v. Borders, 43,675 (La.App.2d Cir.12/10/08), 1 So.3d 635, writ denied, 2009-0043 (La.3/6/09), 3 So.3d 487. See also Hays v. Christus Schumpert Northern Louisiana, 46,408 (La.App.2d Cir.9/21/11), 72 So.3d 955.
The manifest error standard applies to the review of medical malpractice cases. Wyatt v. Hendrix, 43,559 (La.App.2d Cir.11/5/08), 998 So.2d 233. A court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State Through Department of Transportation and Development, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989).
Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Where the fact finder’s conclusions are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Simmons v. Christus Schumpert Medical Center, 45,908 (La.App.2d Cir.6/15/11), 71 So.3d 407, writs denied, 2011-1592 *724 (La.10/7/11), 71 So.3d 317, 2011-1591 (La.10/7/11), 71 So.3d 318.
Where there are conflicting expert opinions concerning the defendant’s compliance with the standard of care, the reviewing court will give great deference to the conclusions of the trier of fact. Bailey v. Donley, 44,919 (La.App.2d Cir.12/9/09), 26 So.3d 987; Turner v. Stassi, 33,022 (La.App.2d Cir.5/10/00), 759 So.2d 299; Pinnick v. Louisiana State University Medical Center, 30,263 (La.App.2d Cir.2/25/98), 707 So.2d 1050.
The opinion of the medical review panel is admissible, expert medical evidence that may be used to support or oppose any subsequent medical malpractice suit. Nevertheless, as any expert testimony or evidence, the medical review panel opinion is subject to review and contestation by an opposing viewpoint. The opinion, therefore, can be used by either the patient or the qualified healthcare provider, and the jury, as trier of fact, is free to accept or reject any portion or all of the opinion. McGlothlin v. Christus St. Patrick Hospital, 2010-2775 (La.7/1/11), 65 So.3d 1218.
The appellate court must not reweigh the evidence or substitute its own factual finding because it would have decided the case differently. Pinsonneault v. Merchants & Farmers Bank & Trust Co., 2001-2217 (La.4/3/02), 816 So.2d 270; Hays v. Christus Schumpert Northern Louisiana, supra. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder’s conclusion was a reasonable one. Stobart v. State Through Department of Transportation and Development, supra.
Discussion
The medical review panel in this case was made up of Dr. Todd Thoma, Dr. Louie V. Crook, Jr., and Dr. R. Brian Harris. The panel unanimously found that Dr. Thompson breached the standard of care in this case. The medical review panel opinion states:
(1) At approximately 10:30 p.m. on February 17, 2006 Dr. Mena, the emergency room physician at Richardson Medical |7Center at that time, called Dr. Thompson and discussed Ms. Carroll’s condition with Dr. Thompson. Stella Carroll had been a patient of Dr. Thompson’s for many years. Dr. Thompson gave Dr. Mena permission to admit the patient to the hospital under Dr. Thompson’s care. Shortly after the patient arrived on the floor the patient’s blood pressure was 190/122 and the nursing staff notified Dr. Thompson of this elevated blood pressure. Dr. Thompson then gave orders over the telephone to hold the patient’s enema and he ordered Clonidine 0.2 mg by mouth every 4 hours to be given if her diastolic blood pressure was greater than 100. Dr. Thompson also ordered an NG tube to continuous suction if the patient vomited or continued to be nauseated. These orders were insufficient to address the patient’s medical condition and the patient’s multiple medical needs. Appropriate limits for when Dr. Thompson should have been notified regarding abnormal vital signs were not given by him. Parameters needed to be set by Dr. Thompson as to when he should be notified regarding abnormal blood pressure and other vital signs. Additionally, due to the patient’s gastrointestinal dysfunction, Dr. Thompson should have ordered a way to have the patient’s medications, including her routine medications, administered to her other than orally or through the NG tube.
*725 (2) The aforementioned deviations below the standard of care resulted in an increased risk of the patient suffering an intracranial event.
Dr. Thoma testified at the trial for the plaintiff as an expert in emergency medicine, the treatment of high blood pressure, and internal medicine. Dr. Tho-ma stated that Dr. Thompson breached the applicable standard of care in several ways. He failed to give the nursing staff parameters as to when he should be notified regarding abnormal blood pressure readings. According to Dr. Thoma, Dr. Thompson should have instructed the nurses to call him if the patient’s blood pressure was greater than 140/90. Dr. Thoma testified that Dr. Thompson should not have ordered that Ms. Carroll’s medication be given orally or through her NG tube. He stated that the medication could have been given through an IV or |swith a transdermal patch. He noted that, even the next morning, no arrangements were made for the patient to receive any of her medications by any method other than orally. He said that her condition should have been monitored to make sure that her blood pressure was under adequate control and if not, alternative treatments should have been given.
Dr. Thoma stated that he found no fault with Dr. Thompson for not coming to the hospital the night Ms. Carroll was admitted, but that he should have gone to the room earlier the next day. He did not go to Ms. Carroll’s room until after she had the stroke on the afternoon of February 18. Dr. Thoma testified that the standard of care required adequate treatment of Ms. Carroll’s hypertension. The treatment given in this case was not within the standard of care. According to Dr. Tho-ma, the failure to adequately treat Ms. Carroll’s blood pressure contributed to the stroke which caused her death.
Dr. Terrence Baker testified for the plaintiff as an expert in severe high blood pressure, family practice, and emergency medicine. Dr. Baker practices at Good Samaritan Hospital in Baltimore, Maryland. He examined Ms. Carroll’s medical and hospital records and concluded that Dr. Thompson breached the applicable standard of care in several ways. Dr. Baker said that Dr. Thompson should have moved Ms. Carroll to a higher level of care in the hospital when the nurses notified him that her blood pressure was severely high. He stated that if Ms. Carroll had been placed in the ICU, she would have had more frequent blood pressure monitoring and a lower patient-to-nurse ratio. Dr. Baker maintained that Dr. Thompson | cifailed to recognize that inserting an NG tube and then putting a blood pressure pill into the tube was not sufficient treatment for high blood pressure. He also noted that oral administration of blood pressure medication would not be effective because Ms. Carroll’s bowel was not working or was not working very well. According to Dr. Baker, the blood pressure medication should have been given in an IV, through a skin patch, or through an injection. He said the standard of care required using the safest method of administration of blood pressure medicine. He stated that giving small, frequent amounts of blood pressure medication through an IV is more controllable than giving a dose through a stomach that is not functioning well.
Dr. Baker testified that Dr. Thompson should have followed up to determine if the blood pressure medication was working. Dr. Baker said that the standard of care required Dr. Thompson to see Ms. Carroll on the morning after her admission to the hospital. Dr. Baker opined that if Dr. Thompson had made rounds in the morning, he would have done a physical examination of the patient and would *726 have recognized that the oral blood pressure medication was not working. This would have changed the outcome in this case. Dr. Baker stated that the nursing notes on the morning after Ms. Carroll’s admission to the hospital showed that she had high-pitched bowel sounds indicating poor functioning and the inability to absorb reliably. Also, at approximately 8:30 a.m., Ms. Carroll’s blood pressure reading was 210/110. At noon, her blood pressure was 174/84, but Dr. Baker termed this an aberrant reading.
|inDr. Baker pointed out that Dr. Thompson did not dictate the history and physical for the hospital record in this case until several days later. He indicated that he saw Ms. Carroll before he actually did. The first time he saw her was on the afternoon of February 18, after she began having her stroke. At that time, she was not responsive. However, the medical record stated that the patient was “pleasant, awake, alert, oriented and attentive” and appeared to be “in no acute distress.”
The hospital chart indicates that Dr. Thompson actually examined Ms. Carroll’s abdomen and said that her eyes were equally round and reactive. In fact, the first time he saw her was after the stroke and one of her pupils was extremely dilated. Dr. Baker testified that the discharge summary, made after Ms. Carroll’s death, omitted important information about her blood pressure.
Dr. Euil Eugene Luther testified as an expert in family practice on behalf of Dr. Thompson. He has been an associate professor of family medicine at the LSU Health Science Center at E.A. Conway Medical Center since 1994. Dr. Luther noted that Ms. Carroll’s chief complaints were nausea, vomiting, and constipation. Her fecal impaction had been removed on her first visit to the emergency room. By her third visit, she had adequate bowel sounds and there were indications that her bowels were beginning to function. According to Dr. Luther, when Ms. Carroll was admitted to the hospital under Dr. Thompson’s care, he gave appropriate orders.
| uWhen Dr. Thompson was informed by the nursing staff that Ms. Carroll’s blood pressure was 190/122, he ordered that she be given clonidine by mouth every four hours as long as her diastolic pressure was greater than 100. He also stopped a previous order for an enema that could have increased the patient’s blood pressure. Because there was plenty of evidence of activity in the patient’s abdomen, Dr. Luther said that it was appropriate to give an oral trial of clonidine.
Dr. Luther stated that using IV medication posed the risk of lowering the blood pressure too much. With an NG tube in place, the proper method of administering oral medication was to crush the pill, mix it with water, clamp the NG tube for 45 minutes to one hour, flush the medication through the tube, and give the stomach and intestines a chance to work.
Dr. Luther noted evidence in the nursing notes that, although Ms. Carroll’s blood pressure was “not to the level you would like it,” it was coming down. Each time the clonidine was given, there was a drop in the blood pressure. When asked about Ms. Carroll’s blood pressure reading of 210/110 at 8:25 a.m. on February 18, Dr. Luther said it was time for another dose of clonidine, so it was not unusual for the blood pressure to jump up. Dr. Luther noted that on several occasions, the patient’s blood pressure was found to be elevated. She was given the clonidine and the blood pressure would come down some. By noon, her blood pressure was 174/84, which was evidence of a good response and improving control.
*727 Dr. Luther saw no reason for Dr. Thompson to come to the hospital when Ms. Carroll was admitted or to admit her to the ICU. Dr. Luther did |12not see a need for the nurses to continue to call Dr. Thompson throughout the night. Further, there was no need for Dr. Thompson to call during the night to get Ms. Carroll’s blood pressure readings.
Dr. Luther was not critical of Dr. Thompson for failing to make morning rounds. Dr. Luther said if Dr. Thompson had gone to the patient’s room in the morning after her admission to the hospital, he would have seen a patient who was improving. Dr. Luther testified that the standard of care requires a doctor to do rounds once a day. It does not matter what time of the day it is done.
When questioned about the alleged inaccuracies in the physical and history dictated by Dr. Thompson, Dr. Luther did not perceive any intent to defraud or deceive. Dr. Luther testified that many doctors use information from nurses and emergency room doctors in writing the history and physical in the chart. Dr. Luther said it was clear from the records when Dr. Thompson’s first interaction with Ms. Carroll occurred.
Dr. Luther was questioned about several publications dealing with the treatment of hypertension. One article was “Evaluation and Treatment of Severe Asymptomatic Hypertension” published in the American Family Physician. This article referenced the “Seventh Report of the Joint National Committee on the Prevention, Detection, Evaluation and Treatment of High Blood Pressure.” A third publication was “Management of severe asymptomatic hypertension (hypertensive urgencies).” Dr. Luther stated that severely elevated high blood pressure is 180/110 or greater. An emergency would include symptoms such as headache, chest pain, or Lqshortness of breath with evidence of end-organ damage, which is hypertension that affects the functioning of internal organs such as the heart and kidneys. Severe hypertension with no symptoms and no end-organ damage constitutes an urgency. Dr. Luther testified that Ms. Carroll’s situation was a hypertensive urgency, not an emergency. According to the literature, with a hypertensive urgency, Dr. Thompson had hours to days to lower the blood pressure rather than minutes to hours. The goal was to lower the blood pressure to 160/100 over a course of hours to days. Dr. Luther said that lowering the blood pressure too quickly posed a risk of a heart attack or stroke. One of the medications recommended in the literature was clonidine. Dr. Luther stated that use of an oral medication rather than IV medication was acceptable under the circumstances.
On cross-examination, Dr. Luther was asked about several recommendations in the publications that the plaintiff contended were not followed by Dr. Thompson. One recommendation was to establish a cardiovascular risk profile, because patients with cardiovascular risk factors should be treated more aggressively. Dr. Luther said that, even though Dr. Thompson did not do a cardiovascular risk profile, he knew Ms. Carroll well and had gotten an update on her condition from the emergency room physician. Dr. Luther acknowledged that the cardiopulmonary, neurologic and funduscopic examinations recommended by the articles were not done in this case. Dr. Luther said that these were done by the emergency room doctor.
|14Pr. Luther was asked on cross-examination whether it was a breach of the standard of care to give oral medication if the bowel is not working and the patient has intractable vomiting. Dr. Luther stat *728 ed that Ms. Carroll’s fecal impaction had been removed 12 hours earlier, and that by the time she was admitted to the hospital, her stomach was working fairly well. Dr. Luther said that in his expert opinion, Dr. Thompson applied a recognized treatment that met the standard of care for Ms. Carroll. He found that the treatment was adequate, given the situation, and that Dr. Thompson did what he needed to do.
Dr. Thompson testified at the trial. He had been in family practice in Rayville, Louisiana, for many years and had treated Ms. Carroll for approximately 20 years. He was familiar with her medical problems which arose in the mid-1980s and resulted in her paralysis. He outlined other medical problems that Ms. Carroll had experienced and noted that she had a stroke in the 1980s or 1990s which resulted in weakness in the left upper extremity. Dr. Thompson said that over the past several years, Ms. Carroll had been hospitalized 20 times. Home health personnel went to Ms. Carroll’s house three or four times a week.
Regarding the facts at issue here, Dr. Thompson testified that he was not notified until Ms. Carroll’s third visit to the emergency room. He admitted her to the hospital and ordered an NG tube, a saline IV, an enema, potassium, and most of her regular medications. The nurses on the floor called him about Ms. Carroll’s high blood pressure and Dr. Thompson told them to hold the enema and to give her clonidine, a drug he found to be safe|1Band effective for lowering blood pressure. He ordered that the clonidine be given every four hours as long as the diastolic blood pressure was greater than 100.
Dr. Thompson had treated Ms. Carroll for bowel problems in the past and he knew that her x-rays in this instance showed that she no longer had a bowel obstruction. He thought her bowel was getting back to normal. He felt that her blood pressure was properly classified as a hypertensive urgency and not an emergency. She did not have end-organ damage which would have involved the brain, kidneys, and heart.
Dr. Thompson said that he did not see a reason to go to the hospital when Ms. Carroll was admitted. He knew that the nurses would call him if the need arose. Dr. Thompson stated that it was acceptable to administer the medication through the NG tube. He did not go to the patient’s room on the morning of February 18, because her blood pressure was trending down and the nurses had not notified him of any worsening of Ms. Carroll’s condition. He found it more convenient to do hospital rounds at lunch after the patients had received their morning care.
He went to Ms. Carroll’s room that afternoon as soon as he was contacted. She was having seizure activity and her right pupil was extremely dilated, indicating brain damage. She was transferred to the ICU.
A CT scan of her brain showed a large bleed in the mid-brain on the left side, consistent with a stroke. Dr. Thompson said the cause of the intracranial bleed was her longstanding chronic hypertension.
|inDr. Thompson testified that he disagreed with the medical review panel opinion and Dr. Thoma’s testimony. Dr. Thompson pointed out that Dr. Thoma is an emergency room doctor and has a different practice from a family practice physician. He said that ER doctors tend to take a more aggressive approach. Dr. Thompson said that IV blood pressure medications can lower blood pressure too much. According to Dr. Thompson, the standard of care required a slow approach to lowering blood pressure.
*729 When asked about the articles on hypertension testified to by Dr. Luther, and whether Dr. Thompson should have performed a history and physical exam when Ms. Carroll was admitted, as well as a cardiovascular, neurological, and fundu-scopic examination, Dr. Thompson said he was acquainted with Ms. Carroll’s risk factors and that she had been examined in the emergency room. Dr. Thompson stated that he was very familiar with Ms. Carroll, followed her almost weekly on home health reports and was up-to-date on her cardiovascular risk profile. Regarding the funduscopic examination, Dr. Thompson stated that he had examined her eyes “a gillion times.”
When questioned about giving oral medication with Ms. Carroll’s bowel problems, Dr. Thompson testified that he thought the bowel was coming around and that giving blood pressure medicine by mouth was in accordance with the literature and the methods he was taught for dealing with this type of problem. He said he did not consider using a skin patch to | ^administer blood pressure medication because Ms. Carroll was experiencing some sweating and he did not think the patch would stay on.
Dr. Thompson testified that he thought he had Ms. Carroll’s blood pressure under control. He stated, “it was a steady, safe, slow decline throughout the a.m. hours and ... she’d even gotten her home medications and by 12:00, it was right where it should have been in a patient like this.”
Dr. Thompson stated that there was not a shred of evidence in the chart that Ms. Carroll was experiencing end-organ damage. Her blood pressure readings throughout the night were not good, but they were adequate. He said that if the nurses had called him in the night, he would have continued the same treatment.
Dr. Thompson was questioned about the history and physical dictated in the patient’s hospital chart. He said he gleaned the information from the emergency room chart and that everyone does the patient description in the way he did it. Dr. Thompson said that he did not think he made any mistakes in his treatment of Ms. Carroll.
In this case, the plaintiff presented expert testimony to establish that Dr. Thompson breached the standard of care in his treatment of Ms. Carroll by failing to come to the hospital to examine her on her admission to the hospital, failing to admit her to the ICU, failing to establish her cardiovascular risk profile and failing to make a cardiopulmonary, neurological, and funduscopic evaluation. The plaintiff also presented evidence to show that Dr. Thompson breached the standard of care by ordering that Ms. Carroll’s blood pressure medication be given orally when | isher bowel was not working well, in failing to set proper parameters for the nurses to contact him regarding the blood pressure, and in failing to follow up to determine whether the blood pressure was coming down sufficiently. The plaintiff sought to show further breaches in the standard of care when Dr. Thompson did not make rounds and see Ms. Carroll the morning after her hospital admission.
Dr. Thompson presented evidence and testimony to establish that Ms. Carroll was experiencing a hypertensive urgency and not a hypertensive emergency, and that his treatment of her condition was in conformity with the medical literature. Dr. Thompson presented his own testimony and expert testimony to show that there was no need to admit Ms. Carroll to the ICU or for Dr. Thompson to come to the hospital on the night of her admission. He presented evidence that the patient was examined by the emergency room doctor *730 and that Dr. Thompson was well acquainted with Ms. Carroll’s cardiovascular risk factors. He also presented testimony that Ms. Carroll’s bowel was functioning adequately and that ordering that the blood pressure medication be administered orally was a safe and effective method. Dr. Thompson presented testimony that Ms. Carroll was responding to the blood pressure medication and that he did not breach the standard of care by failing to see Ms. Carroll on the morning after her admission to the hospital.
The jury in this case weighed the evidence and made determinations regarding the credibility of witnesses. Given the two permissible views of the evidence in this case, the jury’s choice to accept Dr. Thompson’s view [19that he did not breach the standard of care was reasonable and was not manifestly erroneous or clearly wrong. Therefore, we affirm the jury verdict and the trial court judgment finding that Dr. Thompson did not breach the standard of care and was not at fault in Ms. Carroll’s death.
TESTIMONY OF DR. LUTHER
The plaintiff argues that the jury erred in relying on the opinions of Dr. Luther, when those opinions were unsupported and had no factual basis. Ms. Crockham contends that Dr. Luther was a family practice instructor at LSU, but never actually practiced family medicine and did not know what the applicable standard of care was. This argument is without merit.
Legal Principles
In order for an expert opinion to be valid and merit much weight, the facts upon which that opinion is based must be substantiated by the record. When the expert opinion is based upon facts not supported by the record, the opinion may be rejected. Brown v. Eppinette, 36,405 (La.App.2d Cir.12/18/02), 833 So.2d 1268; Barry v. Plaquemine Towing Corporation, 96-0979 (La.App.1st Cir.8/4/97), 698 So.2d 1017, writ denied, 97-2579 (La.1/9/98), 705 So.2d 1102; Robin v. Mississippi Fast Freight Company, Inc., 97-2556 (La.App.1st Cir.12/28/98), 744 So.2d 42, writ denied, 99-0688, (La.4/30/99), 741 So.2d 16; Meany v. Meany, 94-0251 (La.7/5/94), 639 So.2d 229.
Discussion
Many of the cases cited by Ms. Crock-ham deal with expert opinion testimony based upon hypothetical questions that were not based upon facts ^established in the record. That is not the situation presented in this matter. Dr. Luther’s testimony is set forth above. The plaintiff argues that the jury should not have accepted Dr. Luther’s testimony because he had never practiced outside a hospital, was not experienced in private family practice medicine and did not know what the standard of care was. The record demonstrates that Dr. Luther had years of experience in family practice medicine in the hospital setting, including training family practice residents. The plaintiff did not object to Dr. Luther’s qualifications to testify as an expert in family practice medicine. Any questions the plaintiff had regarding Dr. Luther’s experience or the validity of his opinions were fully explored and presented to the jury by the plaintiffs counsel during cross-examination.
The plaintiffs argument that Dr. Luther did not know what the standard of care was is not supported by the record. The plaintiffs counsel extensively questioned Dr. Luther about what the standard of care required in this case and whether it was breached.
The plaintiff argues that Dr. Thompson did not follow the recommendations for care in the medical literature discussed in Dr. Luther’s testimony in determining whether Ms. Carroll’s hypertension was *731 symptomatic or asymptomatic and that Dr. Luther did not give any reasons why the administration of oral blood pressure medication was within the standard of care in this case. As discussed above, Dr. Luther testified that, by the time Ms. Carroll was admitted to the hospital, her fecal impaction had been removed 12 hours earlier and there were indications that her bowels were |2ibeginning to function. Because of these factors, Dr. Luther said it was appropriate to give oral blood pressure medication which seemed to be working to lower the patient’s blood pressure. Dr. Luther stated that, although Dr. Thompson did not do a cardiopulmonary risk profile on Ms. Carroll or a cardiopulmonary, neurological, or funduscopic examination, Dr. Thompson was well acquainted with Ms. Carroll, knew her risk factors and had the benefit of the emergency room physician’s examination of her.
The plaintiff argues that, according to the medical literature used during Dr. Luther’s testimony, when Ms. Carroll arrived on the hospital floor and was found to have severely elevated blood pressure, Dr. Thompson had a new obligation to go to the hospital to examine her. After extensive questioning on this subject, Dr. Luther was asked if the standard of care required that Dr. Thompson perform a thorough evaluation of the patient once he thought she was in severe hypertension. Dr. Luther replied, “No, sir.”
Under the facts of this case, Dr. Luther gave sufficient reasons for his opinions. The decision to accept or reject his testimony rested with the finder of fact. The jury was not manifestly erroneous or clearly wrong in accepting his testimony.
BREACHES BY RICHARDSON MEDICAL CENTER
The plaintiff contends that the jury erred in finding that the actions of RMC, through its nurses and staff, did not constitute fault that was a substantial factor in the death of Ms. Carroll. Ms. Crockham claims that the nurses should have called Dr. Thompson again when Ms. Carroll’s diastolic 122blood pressure failed to fall below 100. She claims the nurses breached the standard of care by failing to recognize that the treatment ordered by Dr. Thompson was not working to lower Ms. Carroll’s blood pressure sufficiently. The plaintiff contends that the nurses breached the standard of care by allowing Ms. Carroll to be cared for by an unsupervised registered nurse (“RN”) applicant, by administering medication through an NG tube without an order to do so, by not having a nursing plan of care for Ms. Carroll, and in failing to document assessments of the patient. She asserts that she presented expert testimony at trial to establish that these factors were breaches of the nursing standard of care. This argument is without merit.
Legal Principles
Malpractice claims against a hospital are subject to the general rules of proof applicable to any negligence action. Moore v. Willis-Knighton Medical Center, 31,203 (La.App.2d Cir.10/28/98), 720 So.2d 425. A plaintiff must prove that the defendant had a duty to protect against the risk involved, that the defendant breached its duty, and that the plaintiff’s injury was caused by the defendant’s conduct. Hays v. Christus Schumpert Northern Louisiana, supra. Hospitals are held to a national standard of care. The locality rule does not apply to hospitals. Henderson v. Homer Memorial Hospital, 40,585 (La.App.2d Cir.1/27/06), 920 So.2d 988, writ denied, 2006-0491 (La.5/5/06), 927 So.2d 316. Hospitals are bound to exercise the requisite amount of care toward a patient that the particular patient’s condition may *732 require. The mere fact that an injury occurs or an [^accident happens raises no presumption or inference of negligence on the part of the hospital. Hays v. Christus Schumpert Northern Louisiana, supra.
It is well settled that a hospital is liable for its employee’s negligence, including doctors and nurses, under the re-spondeat superior doctrine. Benefield v. Sibley, 43,317 (La.App.2d Cir.7/9/08), 988 So.2d 279, writs denied, 2008-2162, 2008-2210, (La.11/21/08), 996 So.2d 1107, 2008-2247 (La.11/21/08), 996 So.2d 1108; Wells v. Louisiana Department of Public Safety and Corrections, 46,428 (La.App.2d Cir.8/24/11), 72 So.3d 910, writ denied, 2011-2637 (La.2/10/12), 80 So.3d 474. Nurses who perform medical services are subject to the same standards of care and liability as .are physicians. The nurse’s duty is to exercise the degree of skill ordinarily employed, under similar circumstances, by members of the nursing or health care profession in good standing in the same community or locality, along with his or her best judgment, in the application of his or her skill to the case. Little v. Pou, 42,872 (La.App.2d Cir.1/30/08), 975 So.2d 666, writ denied, 2008-0806 (La.6/6/08), 983 So.2d 920.
Discussion
Regarding the nurses at RMC, the medical review panel did not find a breach in the standard of care. The medical review panel opinion stated:
(1) Throughout the emergency room treatment of Ms. Carroll on February 17, 2006 and her subsequent hospitalization the nurses appropriately followed all physician orders.
(2) Ms. Carroll was admitted to the floor at approximately 10:30 p.m. on February 17, 2006. Orders were initially given by Dr. Mena. About 10:45 p.m. the nurses took Ms. Carroll’s blood pressure which was 190/122. Dr. Thompson was ^notified of this reading and at approximately 11:25 p.m. Dr. Thompson gave telephone orders to hold the patient’s enema and he ordered Cloni-dine 0.2 mg by mouth every 4 hours to be given if her diastolic blood pressure was greater than 100. Dr. Thompson also ordered an NG tube to continuous suction if the patient vomited or continued to be nauseated. Pursuant to Dr. Thompson’s orders the nursing staff placed the patient on the NG tube and suctioned approximately 700 cc’s of fluid. At 12:30 a.m. the nursing staff administered the first dose of Clonidine as ordered by Dr. Thompson. During the following 12 hours the nurses appropriately monitored the patient’s blood pressure and administered the Clonidine as ordered by Dr. Thompson. During that time there was no change in the patient’s clinical status. Therefore it was within the standard of care for the nurses not to have called Dr. Thompson until approximately 2:05 p.m. when the patient’s clinical presentation significantly changed, at which time the nurses immediately contacted Dr. Thompson. Thereafter the nursing staff appropriately followed all physician orders.
Dr. Thoma testified that he did not see any breach of the standard of care by the hospital or the nurses in this case.
Dr. Baker testified that the nurses breached the standard of care by failing to recognize that the blood pressure treatment was not adequate and in thinking that there was improvement. Dr. Baker said that the nurses’ failure to put together and record a plan of care for high blood pressure was a breach in the standard of care.
He stated that the hospital did not have a policy for the administration of pills *733 when a patient is on an NG tube. He said that a doctor’s order is required to crush pills and administer them through the NG tube. He found a breach in the standard of care where the hospital chart did not document how the pills were given. He stated that the chart did not document giving blood pressure medications throughout the night. He also noted that LaShelle Stubblefield, one of the nurses who cared for Ms. Carroll, was an |MRN applicant and another supervising nurse was required to cosign her nursing notes. This was not done in this case.
Dr. Baker testified that the nurses had the responsibility to call the doctor and report that the blood pressure medication was not working. He opined that the nurses never recognized the serious condition of the patient.
Patsy Malloy McHan, an RN, testified on behalf of the plaintiff as an expert in the general field of nursing. She disagreed with the medical review panel opinion that there was no breach in the standard of care by the nurses who took care of Ms. Carroll. She stated that it was below the standard of care to allow an RN applicant to care for a patient without supervision.
She found that the hospital did not have a policy for giving medication through an NG tube. She noted that an RN should know when the clonidine was not working. Because a lot of stomach fluid was removed when the NG tube was put in place, she claimed this showed that the patient was not able to absorb medication through her stomach. According to Ms. McHan, the nurses should have called Dr. Thompson again when he ordered that the blood pressure medicine be given by mouth.
Ms. Stubblefield, the RN applicant who cared for Ms. Carroll immediately after her hospitalization, testified by deposition that she had graduated from RN training in December 2005 and began working at RMC in January 2006. She had taken the RN licensing exam and was awaiting the results. She was working with a temporary nursing license. At RMC, Ms. Stub-blefield had undergone a three-week orientation and training 12f,program with an RN preceptor, Donna Radau. Ms. Radau was working on the floor with Ms. Stubblefield on the night that Ms. Carroll was admitted to the hospital. Ms. Stubblefield contacted Dr. Thompson when she discovered that the patient’s blood pressure was severely elevated. Dr. Thompson verbally gave orders for dealing with this condition.
Ms. Stubblefield was questioned about the lack of a specific order to give the blood pressure medication through the NG tube. She stated that there was no other way to do it. She said that checks of Ms. Carroll’s blood pressure showed that it appeared to be coming down.
Ruth Ann Graham, a licensed practical nurse (“LPN”), testified on behalf of RMC. Ms. Graham worked at RMC, was familiar with Ms. Carroll, and was on duty the night the patient was admitted to the hospital. She stated that Ms. Carroll would come into the hospital often, with the symptoms present in this case, and would get relief from an NG tube. The hospital chart showed that the NG tube removed 700 ccs of stomach fluid from Ms. Carroll. Ms. Graham outlined the procedures for administering medication through an NG tube, including shutting off the suction for about an hour, crushing the pill, mixing it with water in a syringe, and putting the mixture in the tube. Ms. Graham said that clonidine does not work fast and sometimes has to build up to work. She stated that, if the clonidine had not worked at all, the nurses would have contacted Dr. Thompson. When questioned about notes in the hospital chart that the clonidine was working, Ms. Graham testified that she did *734 not say that the medication was completely effective; she said that it was “working.” Ms. Carroll’s blood [^pressure was checked every four hours. Ms. Graham’s last note in the chart was made at 6:00 a.m. on February 18. At that time, Ms. Carroll’s blood pressure had come down from 190/112 to 181/106.
Belinda Jane Holton was an RN at RMC. She testified that Ms. Carroll had been a patient numerous times over the years. Ms. Holton worked the day shift on February 18, when Ms. Carroll had her stroke. That morning, Ms. Carroll was feeling better. About 2:00 p.m., an LPN notified Ms. Holton that Ms. Carroll was having difficulty breathing. Ms. Holton said that the patient was unresponsive, she had seizure activity, and her eye position indicated a brain problem. Ms. Carroll’s blood pressure was 210/134. When questioned about the degree of supervision required for an RN applicant, Ms. Graham stated that a preceptor was not required. It was sufficient to have another RN on the floor.
The jury heard the testimony from the plaintiffs experts and from the nurses who were on duty during Ms. Carroll’s hospitalization. The jury also examined the evidence, including the hospital record and the medical review panel opinion, as well as hearing testimony from Dr. Thoma, a member of the medical review panel. The jury weighed the evidence and the testimony of the witnesses and found that there was no breach of the standard of care by RMC or by its nurses in this matter. This was a reasonable view of the evidence and testimony. The jury was not manifestly erroneous or clearly wrong. Accordingly, we affirm the jury’s verdict and the trial court judgment.
^CONCLUSION
For the reasons stated above, we affirm the jury verdict and the trial court judgment in favor of Dr. David Thompson and Richardson Medical Center, rejecting the claims of the plaintiff, Patricia Carroll Crockham, arising from the death of her mother, Stella Carroll. All costs in this court are assessed to the plaintiff.
AFFIRMED.