DREW, J.
| plaintiff, 18-year-old Jerade Sanders, suffered a catastrophic injury in a four-wheeler accident on April 20, 2007, when he sustained multiple fractures to his right hip area. Following the initial surgery by the defendant, Dr. Richard Bal *1207 lard, Sanders underwent a difficult recovery. After a number of followup visits with Dr. Ballard and physical therapy sessions, Sanders sought a second opinion from Dr. Jeffrey Lee Garrison,[1] who performed a second operation. Ultimately, Sanders brought a medical malpractice action against Dr. Ballard.
Three orthopedic surgeons comprising the Medical Review Panel (MRP) made the following findings:
(1) Jerade Sanders sustained a fracture of the base of the femoral neck in his right hip together with a fracture of the greater trochanter. On April 22, 2007, Dr. Ballard performed an open reduction with internal fixation. The panel finds that the reduction achieved was adequate. The panel further finds that due to the complexity of the fracture there were options as to what fixation device to use and the fixation device used by Dr. Ballard was acceptable.
(2) However, during the first month following the surgery, imaging studies showed that the fixation device was failing and the internal fixation needed to be revised. Dr. Ballard did not recognize this and it was not until the patient was seen by another ortho-paedic surgeon in July of 2007 that this was diagnosed and a surgery to revise the failure of fixation performed.
(3) The delay in the surgery to revise the internal fixation resulted in the patient experiencing pain and the delay also made the revision surgery more complicated.
At the trial conducted March 19-21, 2012, the jury heard medical testimony from Dr. Ballard, Dr. Garrison, and from orthopedic surgeon Dr. ^Elliot Leitman, the plaintiffs expert witness. Sanders and his mother also testified. The jury reached the following verdict:
1. Do you find that Dr. Richard Ballard breached the applicable standard of care in his treatment of Jer-ade Sanders? YES
2. Do you find that Dr. Ballard’s breach of the standard of care in his treatment of Jerade Sanders caused injury to Jerade Sanders that would not have otherwise occurred? NO
Sanders appealed the jury’s verdict and subsequent judgment that Dr. Ballard’s breach of the applicable standard of care did not cause Sanders an injury which would not otherwise have occurred. Sanders also complained that the trial court committed legal and manifest error in denying his motion in limine to exclude at trial portions of the testimony of Dr. Leit-man.
For the following reasons, the judgment in favor of the defendant is affirmed at plaintiffs costs.
MEDICAL TESTIMONY
Following the accident, Sanders was taken by ambulance to the emergency room of the Winn Parish Medical Center, where he was evaluated. A radiology report showed “a comminuted[2] intertrochan-teric [3] fracture of the proximal femur with *1208 slight impaction and separation of the fracture site.” Sanders was transferred within hours to Lincoln General Hospital for treatment by Dr. Ballard.

Dr. Ballard

1 sThe top of the large thigh bone, the femur, was badly fractured with the large trochanter (outer bulge felt at top of outer thigh) broken off along with a complete break across the neck of the femur which connects this large thigh bone to its head (ball of bone at top of femur which fits into the bone socket in the pelvis to form the hip). In simplest terms, Sanders’ thigh bone was literally disconnected from the hip bone as a résult of the crash. A break also occurred in the femur head itself. Sanders also suffered foot drop, a condition caused by trauma to the actual nerve. The misaligned leg fracture would have stretched the nerve tremendously.[4]
Dr. Ballard explained that hazy areas shown in the X-rays were lots of little pieces of bone. The fracture was at least 200% displaced, meaning the thigh bone was “nowhere near it’s supposed to be.” Sanders’ very bad hip fracture needed surgical repair to reduce the fracture.[5] Dr. Ballard testified he explained the risks of the surgery at Sanders’ bedside to Sanders’ mother. The doctor’s first concern was to protect the blood supply going to the head of the femur. If the blood supply was damaged, the head of the bone could die resulting in loss of function of the hip.
Once Sanders was put to sleep and before surgery itself, Dr. Ballard tried to manipulate the bones using a portable X-ray as a guide. The effort to externally align the fracture was unsuccessful. The incision revealed additional fracture that could not be seen on the X-ray. Because the bone ends were so far apart, bones poked through muscles which were between |4the broken bone ends. In order to align the bone ends of the “incredibly unstable fracture,” muscles, tendons, and ligaments had to be stripped loose.
To realign the fracture, Dr. Ballard secured the trochanter with two pins into the head. When he completed the procedure, a perfect alignment was not possible due to the many little bone pieces. Dr. Ballard explained the Dynamic Hip Screw (DHS) device he chose to implant first stabilized the head and neck and then attached a side plate which slid back and forth to allow the bones to settle and reach a more stable position. Dr. Ballard stated this multiple fracture was in the top 1% of difficulty of all his cases in 25 years of orthopedic surgery practice.
Immediately after surgery, Sanders was in intensive care where he was a difficult and uncooperative patient. Once out of ICU, he became more cooperative. Following surgery, Sanders took a lot of pain medication. Dr. Ballard noted that Sanders had plenty of reason to hurt. “This was a horrible injury. His leg was almost ripped off.” Concerning pain medication,[6] *1209 Dr. Ballard testified his entire treatment of Sanders lasted only eight weeks post injury and Sanders could certainly have been having significant pain no matter what.
On April 29, Sanders was discharged from the hospital with improvement noted in the foot drop. On May 3, Sanders returned to Dr. Ballard’s office, reporting that his hip popped and hurt, he could not move his toes, and it had happenéd three days previously. Dr. Ballard noted that lfiSanders had a devastating hip injury and his knee was stiff and he was reluctant to be active. X-rays showed adequate position but that the DHS had backed out ½ inch, which the doctor stated was “pretty much as expected.”
After a May 10 visit, the X-ray showed no change in the fracture position and Sanders was advised to work on general leg motion and strength and to return in three weeks. The next X-ray showed another quarter inch of shortening and the settling of the general position. Dr. Ballard stated he wished sliding had stopped and it was a little more than he hoped would happen.
On May 31, Sanders reported burning and pain going down his leg and in his knee along with increased pain; Dr. Ballard considered most of the pain related to the healing of the damaged nerve.
Dr. Ballard also disagreed with Dr. Garrison’s and the three MRP orthopaedists who criticized him for noting in Sanders’ records on May 31, 2007:
There was a little bit of sliding of the fracture but the general alignment is excellent and everything certainly remains extra articular.
Dr. Ballard explained that the alignment on May 31, when compared with the condition of the bones at the time of the injury, was excellent and could have been easily addressed by an osteotomy.[7]
Acknowledging that he had been criticized for not recommending revision (repair) surgery at that point, Dr. Ballard also recognized that his office notes had no reference to a possible revision surgery. In explanation, |fiDr. Ballard cited his training background and the approach favored by his professors, which was to wait until the fracture was completely healed and stable before additional surgical intervention. When a fracture occurs, the body sends new blood vessels to aid healing. Once it is completely healed, there is less chance of excessive bleeding[8] and other complications. At that point in time, Dr. Ballard stated he had achieved excellent control of the femur head and the trochan-, ter with preservation of the femur head being a paramount concern. He also stated that an early surgical repair intervention could have resulted in the head falling off, which would have caused a loss of hip integrity.
The physical therapist sent a note to Dr. Ballard attributing Sanders’ pain and difficulties in physical therapy to a “rotated ilium.” Dr. Ballard vigorously disputed that characterization and explained the ilium is a large plate-like part of the pelvis that attaches to the spine or sacrum. The therapist’s reference to the ilium made no sense to Dr. Ballard, who checked Sanders’ ilium and found no rotation.[9]
*1210 When Dr. Ballard last saw Sanders on June 14, 2007, his complaints were of pains down the leg and around the knee and shooting pain that the doctor stated were related more to nerve regeneration than the fracture. Dr. Ballard testified that even if the first procedure had been 100% effective with no revision surgery, the nature of Sanders’ injury meant that there was Dgoing to be significant, permanent impairment as a result. Dr. Ballard recommended vigorous range of motion exercises and progressing his activity which would help with soft tissue healing by maintaining flexibility and strength. In addition, physical exercise would prevent contractures.[10]
At that stage of the healing process, Dr. Ballard had no plan to revise his surgery but wanted to wait to see the condition and position when healing was complete. No mention of revision surgery was contained in his notes. Dr. Ballard stated he disagreed with the conclusion of the three doctors on the MRP that Sanders needed revision surgery at that time.
Dr. Ballard also disputed the MRP’s opinion that he failed to recognize that his fixation device failed. In his view, the device did exactly what it was designed to do by allowing sliding and staying intact. Sanders’ fracture collapsed but the fixation device did not fail.

Dr. Jeffrey Lee Garrison

Accepted by the parties as an expert in orthopedic surgery, Dr. Jeffrey Lee Garrison testified that he first saw Sanders on July 16, 2007, in Winnfield. Referred by his Winnfield physical therapist, Sanders sought a second opinion. Dr. Garrison described Sanders’ injury as a “very high energy injury with severe displacement. It is a — a horrible injury. It involves the femoral neck and the proximal femur with a hundred percent displacement and com-minution.” One hundred percent displacement meant that several bone fragment ends were not touching each other. Sanders had great difficulty with physical rehabilitation. Dr. Garrison’s examination | ^revealed significant loss of range of motion and foot drop related to nerve deficit. Dr. Garrison noted that the condition of the femur and hip, if left alone, would have caused severe disability and inadequate hip function.
Describing it as a “very, very difficult fracture,” Dr. Garrison testified this was among the worst he had ever seen or repaired. In the last 13 years of his practice in which he had seen many trauma cases, he had only seen two or three similar fractures. The fact that the fracture moved and became misaligned, requiring revision surgery, did not indicate anything was wrongly done with the initial surgery; in fact, he thought Dr. Ballard did nothing wrong in the first surgery. On cross-examination, Dr. Garrison observed that while he would have chosen a different fixation device initially, at the time of his revision surgery, the femur neck was adjoined to the other fragment of the proximal femur. Dr. Ballard’s surgery would have been a lot harder to do because he had to address the neck fracture.
Dr. Ballard’s initial surgery used a DHS for fixation of the fractures. The device allowed the bones to compress together by telescoping back. The head of the femur was well preserved, avoiding avascular necrosis of the femoral head, a critical goal in preserving the hip joint. The neck and head of the femur were healing properly. His joint space was fine. Sanders’ leg shortening was to be expected. Following *1211 Dr. Ballard’s surgery, the lower broken fragment secured by the DHS had slid too far, resulting in malalignment of Sanders’ fracture.
Dr. Garrison testified that he chose to do revision surgery at that time, not only because of the fracture misalignment but because Sanders was not doing well clinically and was going to need a revision surgery at some point. | 9Pr. Garrison acknowledged some doctors do revision after maximum healing has occurred. In the revision surgery performed July 20, 2007, Dr. Garrison removed all the hardware installed by Dr. Ballard and installed a Dynamic Compression Screw and plate. This method was designed to halt sliding while allowing the fracture to compress. He acknowledged this was a “very difficult fracture to get to heal. It’s in a difficult area, its in a high energy injury. I think this kid’s a smoker too, which doesn’t help.” The procedure restored the alignment of the hip. Dr. Garrison said he did not think it was perfect but it was a significant improvement. Because of the fragmentation of the initial fracture, Sanders was going to have significant amount of leg shortening, which occurred. Dr. Garrison estimated that shortening to be probably more than two centimeters. His focus was on getting the bone to heal, not addressing the shortening.
Sanders was discharged from the hospital on July 28. He saw Dr. Garrison for follow up on August 6 and September 10, 2007, and January 21 and May 18, 2008, with the final visit on August 18, 2008. When last seen, Sanders was recovering from the foot drop, had a little bit of vault in his gait, and had a significant improvement in mobility. External rotation was significantly limited and internal rotation was well-maintained. He also had good range of motion in hip flexion. The shorter leg length was addressed with a buildup in his shoe. Although functional, Sanders could not be a heavy laborer and would have to do lower physically demanding work. Dr. Garrison recommended aggressive physical therapy to work out scar tissue from the two surgeries and to improve strength and range of motion.
hoFollowing Sanders’ treatment by Dr. Garrison, the unrestrained plaintiff was injured in an automobile accident in 2008 in which he broke the same leg beneath the plate Dr. Garrison had previously installed. Sanders also had a left ankle fracture. Sanders had surgery performed by another doctor in Dr. Garrison’s practice who removed hardware used by Dr. Garrison and installed a rod on the inside of Sanders’ femur.
Dr. Garrison opined that the surgical approach used by Dr. Ballard was acceptable, and he agreed with the MRP’s conclusion that the reduction achieved by Dr. Ballard was adequate and went on to describe it as “very acceptable.” Explaining that he might have chosen a different but similar device had he done the initial surgery, Dr. Garrison stated there were different ways to secure this difficult fracture and noted there were challenges regardless of what device was used. Therefore, the decision was a “tough call.” Dr. Garrison agreed that regardless of the surgical approach first used, there was a chance the device would fail at some point because of the difficulty of the fracture.
Additionally, Dr. Garrison noted that when a fracture site is potentially failing, there can be reasons to delay surgery for one to three months. Soft tissue and potential infection along with secondary damage to a nerve problem are considerations. While X-rays are important, other factors are present in a high-energy trauma. Dr. Garrison characterized a decision on the timing of a second revision surgery to be more of an art than a science, since every patient and every fracture is different. *1212 Dr. Garrison declined to agree with the MRP’s finding that it was medically negligent for | nDr. Ballard not to recognize the device was failing at one month and not to perform a corrective surgery.
The issue of when to perform the corrective surgery was a very legitimate concern in Dr. Garrison’s view. He refused to describe Sanders’ second surgery as an emergency even though he chose to perform the surgery within days after he first examined Sanders. Dr. Garrison stated that swift corrective surgery reflected the way he practiced and that Sanders was a young person with significant problems.
Dr. Garrison, on cross-examination, agreed that the recognition of the failure of the device and the need for revision was not documented in Dr. Ballard’s records. Dr. Garrison disagreed with Dr. Ballard’s May 31, 2007, note in Sanders’ record stating that there was a little sliding of the fracture, but the general alignment was excellent. Dr. Garrison noted there was severe shortening and severe malalignment.
Dr. Garrison specifically disagreed with the MRP’s third finding, that the delay in revising the fixation device resulted in pain to Sanders and resulted in the second surgery being more complicated. Specifically, Dr. Garrison did not think the fracture was harder to fix and stated, “I don’t think that’s a fair assessment.” Dr. Garrison noted that Dr. Ballard’s surgery stabilizing the femur head to the neck made his second surgery easier to perform.

Dr. Elliott Leitman

Dr. Leitman agreed that Sanders sustained a terrible injury and that a fracture this severe is somewhat unusual even for orthopedic specialists to see. In Dr. Leit-man’s opinion, Dr. Ballard breached the standard of care of |12an orthopedic surgeon by failing to reduce the fracture and by using a fixation device that was not going to hold the fracture rigid. He felt the fracture was displaced immediately after Dr. Ballard’s surgery and that condition continued until Dr. Garrison’s second surgery. Dr. Leitman disagreed with the three doctors on the MRP, Dr. Ballard, and Dr. Garrison, all of whom opined that the fixative device installed by Dr. Ballard was acceptable. An additional breach of the standard of care by Dr. Ballard was his failure to recognize that the fracture reduction was failing and was unacceptable and that the patient needed a second procedure.
Sanders’ fracture had three main parts and to have proper healing, the pieces had to be put back together while in this case there was a gap between the bones. By the time of the May 31 X-ray, Leitman noted significant displacement of the fracture, which was not a good reduction. In subsequent X-rays following the surgery, Dr. Leitman stated the fracture continued to collapse and get worse.
Dr. Leitman vigorously criticized Dr. Ballard’s office note of May 31 which stated that there was a little sliding of the fracture but the general alignment was excellent. Dr. Leitman agreed with Dr. Garrison’s characterization of the fracture as “severely displaced and severely mala-ligned.” Dr. Leitman was also critical of Dr. Ballard’s statement on June 14 that Sanders needed vigorous range of motion and progress his activity. According to the witness, such activity would cause Sanders pain but not make things worse because Sanders was already in a bad state. In his view, the day following Dr. Ballard’s surgery, Sanders was not going to get any better until another surgery was done. Dr. Leitman did opine that | iseven if the first surgery had been completely successful, Sanders would have had leg length loss.
According to Dr. Leitman, the only work for which Sanders was suited was light *1213 duty and he would be unable to squat, lift more than 20 pounds, kneel, run or climb and he possibly could have some persistent degree of pain. Walking, running or standing long periods would be difficult, In his view, Dr. Ballard failed to recognize the severity of Sanders’ problem up until the last time he saw him on June 14, 2007.
DISCUSSION

Motion in Limine

A motion in limine presents an evidentiary matter that is subject to the great discretion of the trial court, including the trial court’s assessment of the probative value of evidence. The trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, or waste of time. La. C.E. art. 408. State ex rel L.M., 46,078 (La.App.2d Cir.1/26/11), 57 So.3d 518.
Sanders contends the trial court erred in refusing to grant his motion in limine to prevent the jurors from hearing testimony that Dr. Leitman had initially failed to pass his written and oral examinations to become a board certified orthopedic surgeon. Sanders urges that any probative value of that information was outweighed by its unfair prejudice and was misleading to the jury. Moreover, the qualifications for expert witnesses in medical | Mmalpractice litigation set forth in La. R.S. 9:2794(D)(1)[11] do not include board certification. Sanders argues the jury’s decision to find Dr. Ballard not liable was an indication that the jury was prejudiced by hearing about Dr. Leitman’s initial failUre of the board tests.
The record contains evidence that Dr. Leitman was successful on his second attempt at becoming board certified and possessed many impressive qualifications and skills in orthopedic surgery. The jury heard about his outstanding academic training along with his military service after medical school, including assignment at Walter Reed Army Medical Center and active duty in Operation Iraqi Freedom, during which he served full time at Walter Reed and ran an orthopedic clinic at Fort Dix, New Jersey. His experience included surgery on several hundred hip fractures and taking calls for several years at the only Level 1 Trauma Center in the state of Delaware. Dr. Leitman recounted his experience working under the head team physician for the Philadelphia Eagles and the Philadelphia Flyers and service, to a number of high school and minor league baseball teams. His career included over two dozen presentations to orthopedic surgeons and | lfimany published articles. Every time he had been tendered as an ex *1214 pert witness, he had been accepted as an expert in orthopedic surgery. Dr. Leit-man’s active practice included performing 300 to 350 surgeries a year. Board certified since 2002, Dr. Leitman was recently recertified.
Dr. Ballard contended that the evidence of Dr. Leitman’s failure of the certification tests was relevant and highly probative of his qualifications and knowledge. Additionally, Dr. Ballard argued that the factors set out in La. R.S. 9:2794(D)(1) are the minimum requirements for a physician to testify as an expert witness in a malpractice case. Since Sanders’ attorney raised the issue of board certification in tendering Dr. Leitman as an expert witness, Dr. Ballard urged that board certification was relevant to an expert’s knowledge of accepted standards of practice and the expert’s training and experience.
The trial court carefully considered the issues raised in Sanders’ motion in limine and denied the motion. As the ultimate trier of facts, the jury weighed the testimony of experts and decided the weight to be accorded any testimony. The great discretion of the district court judge in determining relevancy and admissibility should not be overturned absent a clear abuse of discretion. Darby v. Sentry Ins. Auto. Mut. Co., 2007-0407 (La.App. 1st Cir.3/23/07), 960 So.2d 226, writ denied, 2007-0638 (La.3/28/07), 953 So.2d 59. Our review of this record showed no abuse of the trial court’s great discretion in the decision to admit evidence about Dr. Leit-man’s board testing. This assignment of error is without merit.

Proof of Causation

hfiWhen a medical malpractice action is brought against a physician, the plaintiff must establish the standard of care applicable to the physician, a violation of that standard of care by the physician, and a causal connection between the physician’s alleged negligence and the plaintiffs resulting injuries. Pfiffner v. Correa, 94-0924 (La.10/17/94), 643 So.2d 1228; Johnson v. Morehouse Gen’l Hosp., 2010-0387 (La.5/10/11), 63 So.3d 87.
The standard of appellate review for medical malpractice claims was discussed by this court in Crockham v. Thompson, 47,505, p. 5-6 (La.App.2d Cir.11/14/12), 107 So.3d 719, 723-24:
The manifest error standard applies to the review of medical malpractice cases. A court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of manifest error or unless it is clearly wrong.
Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Where the fact finder’s conclusions are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.
Where there are conflicting expert opinions concerning the defendant’s compliance with the standard of care, the reviewing court will give great deference to the conclusions of the trier of fact. The opinion of the medical review panel is admissible, expert medical evidence that may be used to support or oppose any subsequent medical malpractice suit. Nevertheless, as any expert testimony or evidence, the medical review panel opinion is subject to review and contes-tation by an opposing viewpoint. The opinion, therefore, can be used by either the patient or the qualified healthcare provider, and the jury, as trier of fact, is free to accept or reject any portion or all of the opinion.
*1215 The appellate court must not reweigh the evidence or substitute its own factual finding because it would have decided the case differently. The issue to be resolved by a reviewing court is not |17whether the trier of fact was right or wrong, but whether the fact finder’s conclusion was a reasonable one.
Citations omitted.
In McGlothlin v. Christus St Patrick Hosp., 2010-2775 (La.7/1/11), 65 So.3d 1218, the supreme court noted the report of the MRP’s expert opinion is admissible, but not conclusive. The MRP’s findings can be used by either the patient or the qualified health care provider. The jury, as trier of fact, is free to accept or reject any portion or all of the opinion.
Dr. Ballard did not appeal the portion of the verdict finding that he breached the standard of care in his treatment of Sanders. As to Dr. Ballard’s initial surgery and the decisions associated therewith, the three orthopedic surgeons on the MRP and Drs. Ballard and Garrison opined that the surgery itself and the fixation device used were acceptable. The complex, serious nature of Sanders’ injury and the different surgical approaches available along with the testimony recounting Dr. Ballard’s methods show the bases for these conclusions, notwithstanding Dr. Leitman’s opinion to the contrary.
The three MRP doctors opined that Dr. Ballard did not recognize that the fixation device was failing and needed repair during the first month after surgery. Dr. Garrison and Dr. Leitman strongly disagreed with Dr. Ballard’s May 31, 2007, notation in plaintiff’s record that:
His X-ray does show that he has had a little sliding of the fracture, as would be expected, but general alignment is excellent and everything certainly remains extra-articular.
While testifying that Dr. Ballard’s initial surgery and choice of fixation device were appropriate and very acceptable, Dr. Garrison said he disagreed |1swith Dr. Ballard’s assessment and found there was severe shortening and severe malalignment on May 31. Dr. Leitman judged that Dr. Ballard’s note indicated a breach of the appropriate standard of care by not recognizing the fracture reduction was failing and that the plaintiff needed repair surgery.
Dr. Ballard explained his reasoning and lack of documentation as concerning repair surgery was based upon not wanting to confuse the patient and his family with too much information. That Sanders would inevitably need revision or repair surgery following Dr. Ballard’s effort and the complete absence of any notes by Dr. Ballard to show he recognized this fact are reasonable bases on which the jury could have found a breach by defendant of the appropriate standard of care for this patient.
Since the jury concluded that Dr. Ballard did breach the applicable standard of care in treating Sanders, the primary issue is whether the jury was reasonable in finding that Dr. Ballard’s breach did not cause injury to Sanders that otherwise would not have occurred. The record is replete with testimony showing that the jury’s conclusion was reasonable.
Sanders correctly argued that he suffered extreme pain, deformity of the right hip and severe shortening of his leg. However, given the cataclysmic injury in the four-wheeler accident, the jury reasonably concluded that a problematic outcome was inevitable given the nature of the injury itself. Drs. Ballard, Garrison, and Leit-man all agreed the injury was unusual and severe. Dr. Ballard stated that Sanders was in significant pain and his need of medication was reasonable, since his leg was almost ripped off. The soft tissue injuries resulting from the trauma itself and the efforts to repair the fractures in *1216 evitably resulted in pain, loss of range of movement, |19stiffness and leg shortening. Physical therapy to regain strength and range of motion was going to be difficult and painful. According to Dr. Garrison, Sanders’ injury would result in significant permanent impairment regardless of the medical care given.
The bone fragmentation of the initial fracture was going to cause significant leg shortening. While Dr. Garrison recognized that inevitable result, his surgery focused on healing the bone and not on addressing the leg shortening. Additionally, Dr. Garrison categorically stated that Dr. Ballard’s surgery did not make his repair surgery more difficult and in fact that Dr. Ballard’s successful efforts to save and preserve the viability of the femur head made his surgery less difficult. Dr, Garrison also recognized that different medical philosophies existed concerning the optimum time to perform repair surgery to a complex fracture and stated the time lapse before his July surgery did not make the operation more complex.
The three MRP orthopedic surgeons, Dr. Ballard, and Dr. Garrison all agreed that Dr. Ballard’s treatment did not result in injury that would not otherwise have occurred. This young plaintiff sustained a calamitous trauma with devastating results due to the severe nature of the multiple fractures and shattered bone fragmentation. The following year he re-injured the same leg in an auto crash which occurred when he was unrestrained. That mishap led to the third surgery and another replacement of the hardware for the initial fracture.
The jury’s determination that Dr. Ballard’s breach of the standard of care in his treatment of Jerade Sanders did not cause any injury to Jerade 1 ^Sanders that would not have otherwise occurred is reasonable. Our review of this record revealed no manifest error or clear wrong.
At plaintiffs costs, the judgment is AFFIRMED.

.Contrary to suggestions by the plaintiff, nothing in the record suggests that the fact that Dr. Ballard and Dr. Garrison at one time cooperated in providing orthopedic care to the Grambling State University football team resulted in any "attempts to assist” his friend when Dr. Garrison was called upon to give his expert opinions about the case.

. A comminuted fracture is one in which the bone is splintered or crushed into numerous pieces. Merriam-Webster Medical Dictionary, 2006.

. Intertrochanteric means occurring between the two trochanters. The greater trochanter is on the outer part of the upper end of the femur shaft at its junction with the neck while *1208 the lesser trochanter is located at the lower back part of the junction of the femur shaft and the neck. Merriam-Webster Medical Dic-tionaiy, 2006.

. Both Dr. Garrison and Dr. Leitman agreed that the foot drop condition was caused by trauma to the nerve which occurred in the accident.

. A reduction is the restoration of a bodily condition to normal or realigning the broken bones into proper position. Merriam-Webster Medical Dictionary, 2006.

.The record contains conflicting and unclear testimony about Sanders’ previous drug use for migraines, suggestions that Sanders possibly abused drugs, and his mother’s statements that she gave Sanders less pain medication than prescribed because she did not want him to have a drug problem.

. Osteotomy is a surgery in which a bone is divided or a piece of bone is excised.

. In Dr. Garrison's revision surgery, Dr. Ballard observed that in a normal hip replacement blood loss would be less than 500 to 700 milliliters while Sanders lost 1500 milliliters of blood and received nine units of blood during his hospitalization for the second surgery.

.Dr. Garrison also stated he was uncertain what the physical therapist (who had referred Sanders to Dr. Garrison) meant by "right ilium rotation.”

. Contracture is a permanent shortening of muscle, tendon or scar tissue producing deformity or distortion.

. D. (1) In a medical malpractice action against a physician, licensed to practice medicine by the Louisiana State Board of Medical Examiners under R.S. 37:1261 et seq., for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who meets all of the following criteria:
(a) He is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose.
(b) He has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim.
(c) He is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of care.
(d) He is licensed to practice medicine by the Louisiana State Board of Medical Examiners under R.S. 37:1261 et seq., is licensed to practice medicine by any other jurisdiction in the United States, or is a graduate of a medical school accredited by the American Medical Association’s Liaison Committee on Medical Education or the American Osteopathic Association.