Judgment rendered July 23, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

\*\*\*\*\*\*

ON REMAND

\*\*\*\*\*\*

No. 56,039-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

\* \* \* \* \*

DARCY DRIVER, DEANN                    Plaintiffs-Appellants
DRIVER AND DANIELLE
DRIVER-ROUSSEL,
INDIVIDUALLY AND ON
BEHALF OF THEIR DECEASED
PARENTS, ALBERT DRIVER, JR.
AND KATHIE DRIVER

versus

WILLIS KNIGHTON                        Defendants-Appellees
PIERREMONT HEALTH
CENTER, ET AL

\* \* \* \* \*

On Remand from the
Louisiana Supreme Court

Originally Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 618,081

Honorable Brady D. O'Callaghan, Judge

\* \* \* \* \*

NELSON & HAMMONS, APLC                 Counsel for Appellants,
By: John L. Hammons                    Darcy Driver, Deann
    Cornell R. Flournoy                Driver, and Danielle
    William W. Murray, Jr.             Driver-Roussel
    R. Clayton Christian

WATSON, BLANCHE,
WILSON & POSNER
By: Craig J. Sabottke
    Courtenay S. Herndon

Counsel for Appellees,
Willis Knighton Medical
Center and Nikunj
Kantilal Parikh, M.D.

MCNEW, KING & LANDRY, LLP
By: Brady Dean King, II

Counsel for Intervenor
Appellee, Louisiana
Patients Compensation
Fund Oversight Board

\* \* \* \* \*

Before STEPHENS, THOMPSON, and ROBINSON, JJ.

**THOMPSON, J.**

This civil case has returned to us on remand from the Louisiana Supreme Court to apportion fault among the defendants in this matter. *Driver v. Willis Knighton Pierremont Health Ctr.*, 25-00391 (La. 6/25/25), --- So. 3d ---, 2025 WL 1753563.

A seventy-one-year-old man presented for treatment at the emergency room for a variety of ailments, and during his visit one of his daughters took a photograph of a rash on his face which turned out to be an outbreak of what is commonly referred to as shingles. For his shortness of breath, he was prescribed a diuretic and instructed to see his cardiologist. The patient was not diagnosed with shingles and the medical records from his visit, which later were proven to contain inaccuracies and errors, did not reflect any rash on his face during his presentation. Three days later he returned to a separate emergency room as the rash on his face had worsened, and he was diagnosed with shingles that had moved from his face to his brain via the optic nerve, and he was immediately admitted to the hospital for treatment.

For the next three weeks he remained in the intensive care unit before being transferred to a nursing care facility, where he remained until his death 18 months later. During that time, he suffered seizures and mental incapacity linked to the infection in his brain from the untreated shingles. After his death, his daughters filed suit against the emergency room doctor and his employer, the hospital. A jury found that the daughters did not prove the standard of care owed to the patient by the doctor or the hospital, and the daughters appealed that ruling. Finding, based upon the evidence and testimony adduced at trial that the jury was manifestly erroneous, we reverse the verdict of the jury, and after a *de novo* review, we find that the

daughters successfully proved their medical malpractice claims, and award damages.

## FACTS AND PROCEDURAL HISTORY

On July 29, 2017, Albert Driver ("Mr. Driver") was brought to the emergency room at Willis-Knighton Pierremont Health Center ("Willis-Knighton") by his wife, Katherine Driver, with complaints including shortness of breath and general malaise. He was treated by Dr. Nikunj Parikh ("Dr. Parikh"), an ER physician, and discharged a short time later that same day. Shortly before his discharge, his adult daughters, Deann and Darcy Driver, came to see him at Willis-Knighton. Deann later testified she was shocked by the rash on her father's face when she arrived at the hospital that day, and she took a photograph of it on her cell phone. Mr. Driver was discharged from the hospital without receiving any treatment for the rash on his face.

As his condition worsened over the next few days, his family took him back to the ER, this time to Willis-Knighton North. Upon presentation the rash on his face had worsened over the three-day period, and Mr. Driver was diagnosed with herpes zoster, also known as shingles, consistent with a trigeminal one nerve distribution on the left side of his face and forehead around his eye. The doctors at Willis-Knighton North determined that the shingles had moved from his face to his brain through the optic nerve and diagnosed him with herpes encephalopathy. Herpes encephalopathy is a life-threatening disease, and Mr. Driver was immediately admitted to the hospital for treatment. He spent three weeks in the ICU being treated with an intravenous antiviral medication called Acyclovir. The medical records indicate Mr. Driver suffered complications and neurological impairment,

including epilepsy, right middle cerebral artery occlusion, left-sided weakness, left facial droop, left gaze preference, seizures secondary to encephalopathy, intraparenchymal hemorrhage, and cognitive difficulties secondary to herpes encephalopathy. On August 21, 2017, he was discharged to a rehabilitation center, Pathways, where he stayed for a few weeks, until his family was informed that he needed more full-time care. He was then sent to Heritage Manor South, a full-time nursing facility, where he remained until his death 18 months later, on February 2, 2019, from cardiopulmonary arrest related to seizure activity secondary to herpes encephalopathy. Sadly, Mr. Driver's wife predeceased him by 36 hours, so it was his daughters, Deann Driver, Darcy Driver, and Danielle Driver-Roussel (collectively, "plaintiffs"), who filed suit against his initial emergency room treating physician, Dr. Parikh, and his employer, Willis-Knighton (collectively, "defendants") alleging medical malpractice.

The five-day jury trial on this matter began on April 24, 2023, during which Dr. Parikh testified that he treated Mr. Driver on July 29, 2017, in the emergency room at Willis-Knighton. According to the medical records, relied upon by Dr. Parikh, Mr. Driver presented with shortness of breath, and Dr. Parikh ordered oxygen by nasal cannula. Dr. Parikh testified that Mr. Driver's face and head were normal and his skin showed no signs of a rash, relying in part on the information contained in the medical records. He noted that Mr. Driver's medical records reflected that a Foley catheter was in place but, when cross-examined, testified that the records do not indicate that he ever ordered a Foley catheter or that the nursing staff ever placed the catheter, calling into question the accuracy of the medical records regarding Mr. Driver's condition and treatment. Dr. Parikh admitted that he would not

3

have placed a catheter on a patient complaining of shortness of breath alone. Dr. Parikh testified, again relying in part on the medical records, that he did not diagnose Driver with shingles or prescribe him antiviral medications. Dr. Parikh was shown the photograph taken by Deann Driver on the day of Mr. Driver's treatment by Dr. Parikh and testified as follows:

> Q: Is there anything about that photograph that is inconsistent with your memory of his appearance on that day?

> A: Well, according to my note, there was no redness or no rash in the face. And that picture does show the rash. So I'm not sure when was the picture taken?

Dr. Parikh testified that since Mr. Driver presented with shortness of breath, he ran some tests and then he ordered Lasix, an IV medicine to reduce the fluid in his body. Dr. Parikh stated that Mr. Driver improved drastically and was discharged with instructions to see his cardiologist. Dr. Parikh testified that Mr. Driver did not complain of pain and did not have a rash on his face, again relying on his note in the medical records.

Darcy Driver ("Darcy") testified that Mr. Driver was her father and that both he and her mother were deceased by the time of the trial. She described how she snapped a photo of her father's face in the ER on July 29, 2017, because she was shocked at the rash. Darcy stated that the copy of the photo shown to the jury had not been color edited or filtered and that it was accurate to the way his face looked on the day in the ER. She stated that he did not have a Foley catheter in place and that the medical records are incorrect. Darcy and her sister took their father to Willis-Knighton North a few days later because the rash on his face had gotten so much worse. She testified they chose a different hospital so that they could get a different opinion regarding the rash that was still on her father's face and had

4

worsened since he was first seen by Dr. Parikh. She described how her father initially spent three weeks in the hospital and was placed in the medical intensive care unit. Darcy confirmed that after her father was transferred to the full-time nursing facility he never returned home prior to his death. Her mother spent the last 18 months of her life with her husband, Mr. Driver, either in the hospital or the nursing home suffering from the conditions which ultimately claimed his life.

Dr. Huan Le testified that he is an internal medicine doctor who treated Mr. Driver at Willis-Knighton North for his second emergency room visit three days after he had been seen by Dr. Parikh. Dr. Le was accepted by the trial court as an expert in internal medicine. At trial Dr. Le testified:

> Q: Now is it important to the proper management, particularly in an older patient, 71 year old patient, who presents with shingles on his face around his eye in that trigeminal one level, is early diagnosis and early treatment important to the proper, effective management of that condition?
>
> A: That is correct.

Dr. Le testified that patients who develop brain infection from the herpes virus can have seizure disorders and mental status changes. When Mr. Driver presented at Willis-Knighton North, Dr. Le diagnosed him with shingles and began IV Acyclovir. He determined that the shingles had progressed from his face to infect his brain. When shown the photograph from the July 29, 2017 visit to the emergency room, Dr. Le testified:

> Q: Would that picture indicate to you that this rupture and this rash is consistent with shingles?
>
> A: Based on, I don't—I can't be sure. But based on this—based on this picture, I would say yes.
>
> Q: Doctor…if Mr. Driver had presented to you in your Tri-State office with this presentation, this appearance, would you have

5

diagnosed him with shingles and would you have started Acyclovir?

A: Yes, sir.

Q: Doctor, when you look at those three pictures, the one from the 29th and the other two, does it suggest to you that they're-by the time you saw him…as an inpatient at Willis-Knighton North, that there had been a progression, a worsening of this shingles from the picture on the 29th?

A: Yes, sir.

Dr. Le further agreed that if Mr. Driver had been treated with Acyclovir on the 29th, it would have benefited him and lessened his pain and discomfort, sped up his recovery, and would "definitely…lessen complications, especially in his condition." Dr. Le affirmed that more probably than not, if Acyclovir had been administered on the 29th, Mr. Driver probably would not have developed herpetic encephalitis and the resulting complications.

Deann Driver ("Deann") testified about her father's history and personality prior to the infection. She witnessed her sister take the photograph of her father's face. Deann identified the photograph as the one shown to the jury and testified that it was an accurate representation of Mr. Driver's face that day, July 29, 2017, in the ER when her father was seen by Dr. Parikh.

Danielle Driver Roussel ("Danielle"), another of Mr. Driver's daughters, testified about the wonderful relationship between her parents and how her mother cared for her father up until her death. Her testimony was consistent with that of her sisters, Deann and Darcy, regarding the condition of her father, the symptoms and complications he suffered from ultimately leading to his death after 18 months of being in the hospital and then the nursing home.

Dr. Peimin Zhu, a neurohospitalist, first treated Mr. Driver in August of 2017 at Willis-Knighton North. He was consulted because Mr. Driver was having altered mental status due to his shingles infection on August 3, 2017. He testified that he could not say for certain that if Mr. Driver had received the shingles treatment three days earlier, then he would have avoided having shingles encephalitis. Dr. Zhu explained that shingles is a DNA virus which is usually an opportunistic pathogen infecting people with less immunity. The symptoms include blisters on the skin and can cause altered mental status in some people. It presents as a rash with blisters on the skin, and antiviral therapy is the treatment. Antiviral drugs are more effective the sooner they are given. Dr. Zhu testified that Mr. Driver presented on August 3, 2017, at Willis-Knighton North with a rash with blisters on the left side of his face. He testified:

> Q: And you state that he had shingles that started about a week ago. So if this was on the 3rd when you dictated this, a week earlier would have been the 27th or 28th of July. Correct?
>
> A: Yes.
>
> Q: Now, I want to show you…a photograph taken on July 29, 2017, in the emergency department at Willis-Knighton. Does that photographs depict facial rash consistent with shingles in the trigeminal one area?
>
> A: Yes. We can suspect that.
>
> …
>
> Q: And the appropriate treatment that is generally recognized in the medical community is to use the antiviral medications, Acyclovir or one of the other ones that you mentioned to us. Correct?
>
> A: Yes.

Dr. Zhu further testified that shingles can spread from the face and skin to the brain, which is a potentially deadly condition. Shingles can turn into

herpes encephalitis, which can cause epilepsy, which was suspected by Dr. Zhu when Mr. Driver was later hospitalized.  Dr. Shu testified that Mr. Driver's cognitive difficulties could have been caused by herpes encephalitis.

Dr. Brian Caskey was a member of the medical review panel on this case, as an internist.  He testified that the medical review panel determined there was a question of fact on whether the rash existed on Mr. Driver's face at the time of the examination.  He testified that the medical review panel had the photograph taken by the family but were unable to determine its authenticity.  They also had access to Mr. Driver's medical records, which did not mention a rash on the face.  Dr. Caskey testified, "If there was an obvious, clear rash, if it was clear and indistinguishable from anything else on his face, and that was missed, then that would represent a breach in the standard of care."  He stated, "If it was obviously present, then it should have been diagnosed and treated."  When shown the photo from July 29, 2017, Dr. Caskey stated "this photograph does demonstrate a rash in the trigeminal one distribution," and "it is consistent with shingles."  Dr. Caskey stated that if a patient presented with shingles, antiviral therapy should have begun at that time.  Regarding the possible delay in treatment with antiviral medication, Dr. Caskey stated, "So on the 29th if he had been diagnosed and treatment started, what would clinical course look like, we will never know. But as I said, the earlier you start treatment always is preferable."

Justin Moore, MD, is a medical director and emergency department physician and was the defendants' expert witness.  He was accepted by the court as an expert in emergency medicine.  Dr. Moore testified that Dr. Parikh's examination and medical recordkeeping appeared appropriate.  Dr.

Moore testified, based on the medical record, that there were no documented signs of shingles on Mr. Driver on July 29, 2017. Dr. Moore would not confirm that the medical record was inaccurate, testifying:

> Q: Do you have any doubt that this picture was a picture taken of Mr. Driver in the emergency room on the 29th?
>
> A: I don't have any doubt.
>
> Q: There is no record, no indication of any facial, and I'm not talking about shingles now, but, in fact, the medical records of Dr. Parikh and his testimony was this man had a totally normal face. No skin abnormalities at all, correct?
>
> A: Correct.
>
> Q: Does that photograph show skin abnormalities?
>
> A: Yes.

Dr. Joseph Ayers testified that he is an osteopathic physician, and the court accepted Dr. Ayers as an expert in emergency medicine. Dr. Ayers was plaintiffs' expert witness. Dr. Ayers testified that he believed Dr. Parikh violated the standard of care for his treatment of Mr. Driver. He testified that Mr. Driver presented at the ER on July 29, 2017, with a classic shingles rash pattern and the fact that he was not diagnosed and treated for shingles on that day was a violation of the standard of care. He testified that the July 29, 2017, photograph was sufficient to diagnose shingles. Dr. Ayers connected Mr. Driver's death 18 months after his shingles diagnosis to the lack of diagnosis by noting that he had continued seizure activity consistent with the brain injury from the infection. Dr. Ayers was critical of the computer medical charting used, noting that it uses preprogrammed wording to fill in the blanks on the chart and testified that he suspected this computer program had been used on July 29, 2017. Dr. Ayers testified, "I believe it is an unreliable record."

9

Luther Charles Veuleman, RN, testified that he was the nurse on duty at triage in the ER on July 29, 2017. He testified that Mr. Driver complained about shortness of breath during his visit and that if Mr. Driver had complained of a rash, it would be noted in his chart. He testified that Dr. Parikh would have noticed a rash on a patient's face and asked them about it, but on cross-examination he admitted that he was not present for Dr. Parikh's treatment of Mr. Driver. Kayla Kinnebrew, RN, testified that she treated Mr. Driver in the ER on July 29, 2017. She testified that she did not remember noticing a rash on Mr. Driver's face and that if she had noticed one, it would be in the chart. She testified that she did not notice if Mr. Driver had a catheter and that she did not place a catheter while he was in the ER. She could not explain why the medical records state that Dr. Parikh noted a Foley catheter in place on Mr. Driver during his exam. After being shown the photograph of Driver's face from July 29, 2017, Kinnebrew testified that it appeared to be a facial rash and that if he had appeared in the ER with the rash, she would have asked him questions about it.

After five days the trial concluded, and the jury found that the plaintiffs did not prove by a preponderance of the evidence the applicable standard of care owed by Dr. Parikh and Willis-Knighton to Mr. Driver. Plaintiffs filed a motion for judgment notwithstanding the verdict, which the trial court denied. This appeal followed, in which plaintiffs have asserted three assignments of error.

ASSIGNMENTS OF ERROR

**First Assignment of Error: The jury erred in finding that appellants failed to prove, by a preponderance of the evidence, the standard of care applicable to Dr. Nikunj Parikh and his employer, Willis Knighton Pierremont Health Center.**

10

**Second Assignment of Error**: The trial court erred in denying appellants' Motion for Judgment Notwithstanding the Verdict filed pursuant to Art. 1811 of the Louisiana Code of Civil Procedure.

**Third Assignment of Error**: The jury and the trial court erred in failing to find that appellants met their burden of proof pursuant to La. R.S. 9:2794.

## DISCUSSION

In their first assignment of error, plaintiffs argue that the jury erred in finding that they failed to prove, by a preponderance of the evidence, the standard of care applicable to Dr. Parikh and Willis-Knighton. We find that this assignment of error has merit, and as such, pretermits a discussion on the remaining two assignments of error.

An appellate court may not set aside a jury's finding of facts absent manifest error or unless it is clearly wrong. *Sistler v. Liberty Mut. Ins. Co.*, 558 So. 2d 1106 (La. 1990). In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and meet the following two-part test: (1) find that a reasonable factual basis does not exist for the finding; and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. *Stobart v. State, Through Dep't of Transp. & Dev.*, 617 So. 2d 880 (La. 1993). La. R.S. 9:2794(A) provides that the plaintiff in a medical malpractice action has the burden of proving:

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.

11

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

Thus, a malpractice claimant must establish, by a preponderance of the evidence: (1) the defendant's standard of care; (2) the defendant's breach of the standard of care; and (3) a causal connection between the breach and the claimant's injuries. *Pfiffner v. Correa*, 94-0924 (La. 10/17/94), 643 So. 2d 1128; *Harper v. Minor*, 46,871 (La. App. 2 Cir. 2/1/12), 86 So. 3d 690, *writ denied*, 12-0524 (La. 4/27/12), 86 So. 3d 629, *writ denied*, 12-0528 (La. 4/27/12), 86 So. 3d 632.

In the present matter, the jury was presented with the jury verdict form, which asked if the jury found by a preponderance of the evidence that plaintiffs proved the applicable standard of care owed by Dr. Parikh to Mr. Driver, and the jury's response was "No." The second section on the jury form asked if the jury found by a preponderance of the evidence that plaintiffs proved the applicable standard of care owed by Willis-Knighton to Mr. Driver, and the jury's response was "No." After thoroughly reviewing the record of these proceedings considering the above legal principles, we find that a reasonable factual basis does not exist to support the jury's finding that the plaintiffs failed to prove the standard of care owed by Dr. Parikh and Willis-Knighton to Mr. Driver. We find that the jury's verdict is clearly wrong, manifestly erroneous, and must be reversed.

The record reflects testimony that established the standard of care owed by the defendants to Mr. Driver. We note that plaintiffs can establish

12

the applicable standard of care through defense expert testimony and evidence. *Pfiffner*, *supra*. Defendants' expert, Dr. Moore, testified explicitly to the standard of care owed by Dr. Parikh. He testified:

> Q: Doctor, would you agree that emergency departments and emergency medicine physicians such as Dr. Parikh are called upon to effectively determine if presenting patients have emergent medical conditions that could lead to life or limb threatening decline?
>
> A: Yes.
>
> Q: And would you also agree that emergency medicine physicians such as Dr. Parikh are to effectively identify all illnesses based upon presenting complaints, vital signs, past medical history, physical examination findings and primary testing?
>
> A: Yes.
>
> Q: Now with that in mind, are medical records that are produced by an ER physician supposed to be accurate and complete?
>
> A: They are.

Dr. Caskey, a member of the medical review panel, testified that "if there was an obvious, clear rash, if it was as clear and indistinguishable from anything else on his face, and that was missed, then that would represent a breach in the standard of care." He later further testified, "If he had an obvious rash in the trigeminal distribution on the forehead, then that's the issue. If it was obviously present, then it should have been diagnosed and treated."

Dr. Le testified:

> Q: Now, we have developed … a recognized diagnostic criteria for diagnosing shingles and a treatment protocol for early diagnosis and treatment, correct?
>
> A: That's correct.

Q: What would you look for when that patient got to your office?

A: I would look for a rash. Mainly, common presentation would be what we describe as vesicular rash or blisters. A cluster of blister or lesion or rash on the body part. And follow what we, medicine term we call it, dermatome, meaning along the nerve region. So that's what we would be looking for.

Q: Now once, let's assume you make that diagnosis. The patient presents with that presentation and you determine that – that patient has early onset shingles. What is the proper treatment protocol for that condition?

A: Well, [the] patient would require antiviral treatment.

All three of the above doctors were accepted by the court as experts in their respective fields and testified as to the standard of care owed by defendants in this case. There was ample evidence presented to the jury of the standard of care owed by the defendants to Mr. Driver on the day he entered the ER at Willis-Knighton on July 29, 2017. Having reviewed the record in its entirety, we find that a reasonable factual basis does not exist to support the jury's verdict. The jury was clearly wrong and manifestly erroneous in its determination that the plaintiffs failed to prove the standard of care. Therefore, we reverse the jury's verdict.

Considering the fact that the jury erroneously found that the plaintiffs failed to satisfy their burden of proving the standard of care, the other elements required for a malpractice claim were not addressed. Where a fact finder does not reach an issue in rendering its decision because of an earlier finding that disposes of the case, the appellate court, in reversing the earlier finding, must make a *de novo* determination of the undecided issue from the facts presented in the record. *Austin v. Fibrebond Corp.*, 638 So. 2d 1110 (La. App. 2 Cir. 2/23/94), *writ denied*, 94-1326 (La. 9/2/94), 643 So. 2d 149.

14

Since we find that the jury erroneously found that plaintiffs did not meet their burden of proving the standard of care, the jury never reached the issues of the breach of the standard of care, causation, and damages. Thus, we now undertake a *de novo* review of those issues.

Plaintiffs allege that defendants breached the standard of care owed to Mr. Driver by Dr. Parikh's failure to diagnose and treat his facial rash on July 29, 2017. We agree. The record reflects a great deal of testimony regarding the breach of the standard of care. Dr. Caskey was a member of the medical review panel and noted that the medical review panel determined that there was a question of fact regarding the rash on Mr. Driver's face. At trial, Dr. Caskey clarified that the medical review panel did not have the entirety of the evidence included at trial, specifically noting that the photograph of Mr. Driver's face had not been confirmed as being taken on July 29, 2017. Dr. Caskey testified, "If there was an obvious, clear rash, if it was clear and indistinguishable from anything else on his face, and that was missed, then that would represent a breach in the standard of care." He stated, "If it was obviously present, then it should have been diagnosed and treated." When presented by counsel with the photo from July 29, 2017, Dr. Caskey testified, "This photograph does demonstrate a rash in the trigeminal one distribution," and "it is consistent with shingles."

The record overwhelmingly indicates that Mr. Driver presented with the facial rash at the ER on July 29, 2017. The medical experts at trial all agree that the rash was present on his face in the photograph. Dr. Le, Dr. Zhu, Dr. Caskey, and Dr. Ayers all testified that the rash on Mr. Driver's face in the July 29, 2017 photograph is indicative of shingles. Even Dr. Moore, defendants' expert witness, testified that the photograph shows a

facial abnormality.  There is no dispute that the photograph was taken by his daughter while he was in the Willis-Knighton ER on July 29, 2017.  The medical experts also agree that the rash indicates shingles, and that if a diagnosis of shingles is made, a patient should be immediately treated with antiviral medication. Mr. Driver was not afforded that treatment.

Defendants argue that Dr. Parikh and the nursing staff did not note the presence of a rash on Mr. Driver's face in the medical record and that they certainly would have made a note of the rash if it had been present.  While medical records are generally presumed to be reliable, in the present case, plaintiffs were able to show that Mr. Driver's medical records from his ER visit on July 29, 2017 had inaccuracies that could not be explained.  Both nurses and Dr. Parikh testified that Mr. Driver did not have a Foley catheter in place or placed during his ER visit, which contradicts what is included in the medical records.  Mr. Driver's daughters also confirmed at trial that he did not have a catheter on July 29, 2017.  It is undisputed that Mr. Driver's medical records erroneously indicate that he had a Foley catheter on July 29, 2017.  This provable inaccuracy in the medical record more than opens the door for the possibility - and likelihood - of other potential inaccuracies in the medical record, including the fact that Mr. Driver's face and skin were marked as "normal" in the record. Unreliable and inaccurate medical records are just that, unreliable and inaccurate. Unfortunately, when providers are called to testify about one of hundreds of patients treated briefly in an emergency room years earlier, and they rely on the accuracy of those records to refresh their memories and form their testimony, there can be no confidence in any part of an unreliable record to counter a photo of Mr. Driver's condition and testimony by his daughters who were eyewitnesses.

16

While Dr. Parikh testified, in part relying on these same medical records, that Mr. Driver's face and head were normal and his skin showed no signs of a rash when he presented to the ER, Dr. Parikh also testified, when shown the July 29, 2017 photograph:

> Q: Is there anything about that photograph that is inconsistent with your memory of his appearance on that day?
>
> A: Well, according to my note, there was no redness or no rash in the face. And that picture does show the rash. So I'm not sure when was the picture taken?

Dr. Parikh was not attempting to mislead the court or deceptively answer the line of questioning, he was simply relaying what the medical records and his notes reflected from his brief interaction with Mr. Driver years earlier as the foundation of his testimony. Those medical records, however, were proven to be inaccurate and to contain errors.

After a full review of the record, we find that the defendants breached the standard of care owed to Mr. Driver when he was treated at the ER on July 29, 2017. Although his initial complaint may have been for shortness of breath, his face had an obvious facial abnormality that expert medical testimony unequivocally stated indicated shingles and required a diagnosis and prompt treatment, which he did not receive.

In addition to proving the standard of care and a breach of that standard, plaintiffs also have the burden of proving that as a proximate result of the lack of knowledge or skill or the failure to exercise the degree of care, Mr. Driver suffered injuries that would not have otherwise occurred. La. R.S. 9:2794(A)(3). Plaintiffs have asserted that but for the negligence of Dr. Parikh, Mr. Driver would not have contracted herpes encephalopathy as the untreated condition was allowed to progress. Several doctors testified that

patients who develop a brain infection from the shingles virus can have seizure disorders and mental status changes. Dr. Le testified that by the time he diagnosed Mr. Driver with shingles at Willis-Knighton North, the virus had progressed from his face to infect his brain. Dr. Le also testified that if Mr. Driver had received antiviral medication on July 29, 2017, he more probably than not would not have developed herpetic encephalitis and that the earlier treatment would "definitely…lesson complications, especially in his condition." Dr. Zhu testified that antiviral medications for shingles are more effective the sooner they are administered. Dr. Zhu also confirmed that Mr. Driver's seizures and cognitive difficulties could have been caused by the herpes encephalitis. Dr. Caskey confirmed that "the earlier you start treatment always is preferable." Dr. Ayers specifically connected Mr. Driver's death to the lack of shingles diagnosis on July 29, 2017, noting that Mr. Driver had continued seizure activity until his death 18 months later, consistent with the brain injury from the infection. Finally, the record reflects that Darcy Driver testified that her father never returned home after his admission into Willis-Knighton North but, instead, remained in a nursing facility suffering from the resulting complications and symptoms until his death 18 months later.

Based on the foregoing, we find that as a result of the breach of the standard of care by defendants, Mr. Driver suffered injuries and death that would not have otherwise occurred when it did. Mr. Driver suffered significant and oftentimes debilitating and painful symptoms for almost two years that may otherwise have been avoided. Therefore, we find plaintiffs have met their burden of proving the proximate causal connection between

the breach of the standard of care and Mr. Driver's injuries and ultimate death.

La. R.S. 40:1231.2(B)(1) provides that "[t]he total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1231.3, shall not exceed five hundred thousand dollars plus interest and cost." Thus, the total amount recoverable in the instant case for the injuries and death to Mr. Driver is $500,000. The record reflects that the medical bills alone for Mr. Driver totaled $130,995.41.

Darcy's testimony regarding her father's health included how the family had to sign a DNR, or do not resuscitate, during his time at the ICU at Willis-Knighton North because of the seriousness of his condition, which was emotionally difficult for them. She described his short-term memory loss and how her father was having violent flashbacks to his time spent in the military during the Vietnam war as a Green Beret. She testified that he cried out for his mother, who had passed away many years prior to his hospitalization. She described how prior to July 29, 2017, her father was an outdoorsman who loved spending time with his three daughters and his grandson. He had a workshop in the backyard where he built things and made repairs to the home he and his wife shared. Darcy described the difficulties her mother had in caring for her father and how she passed away only a few days before he did. She further testified that Mr. and Mrs. Driver were never the same after the onset of his shingles or during the many months that followed.

Having determined that the plaintiffs satisfied their burden imposed by La. R.S. 9:2794 and considering the 18-month period Mr. Driver suffered

until his death, we award damages in their favor in the amount of the statutory cap, $500,000, in addition to the amount of Mr. Driver's medical bills, $130,995.41, plus interest and costs.

The Louisiana Supreme Court, in *Martin v. Thomas*, 21-01490 (La. 6/29/22), 346 So. 3d 238, stated the following:

> Under Louisiana's pure comparative fault regime, the negligence "of all persons," including those not in the litigation, those without the ability to pay, and the injured victim him- or herself, "shall" be assigned a percentage of fault. La. Civ. Code art. 2323; La. Code Civ. Proc. art. 1812. In addition, a joint tortfeasor cannot be liable for more than his or her degree of fault. La. Civ. Code art. 2324. It is possible that an employer and an employee may both be assigned a percentage of fault, depending on the facts. An employer will still be financially responsible for an employee's percentage of fault if the employee was in the course and scope of employment. The initial assessment of fault required by the law is not bypassed due to the employer-employee relationship.
>
> The assessment of fault shall be made first as required by law. If any fault is assessed to the employee, and if it is determined that the employee was in the course and scope of the employment, then the employer becomes financially responsible for the employee's fault under the theory of respondeat superior. This societal decision as to who actually pays does not change the manner of assessing fault to all parties as required by law.

Considering the above, we apportion 75% of the fault in the present matter to the defendant Nikunj Parikh, M.D. for his failure to recognize and treat Driver's obvious facial rash. We apportion 25% of the fault in the present matter to the remaining defendant, Willis-Knighton Pierremont Health Center, specifically noting the lack of an accurate and trustworthy charting system that produced inaccurate and unreliable medical records in this case. The record reflects that both the doctor and nurses based their testimony on these faulty medical records. We apportion no fault to the decedent, Albert Driver.

20

**CONCLUSION**

For the foregoing reasons, we reverse the jury's verdict and render judgment in favor of plaintiffs, Darcy Driver, Deann Driver, and Danielle Driver-Rousel, against defendants, Willis-Knighton Pierremont Heath Center and Nikunj Parikh, M.D., in the amount of the statutory cap of $500,000 for his injuries, plus $130,995.41 in medical expenses, plus interest and costs. Nikunj Parikh, M.D. is apportioned 75% of fault in this matter and Willis-Knighton Pierremont Health Center is apportioned 25% of fault in this matter.

**REVERSED AND RENDERED.**